**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re Factor VIII or IX | ) | |
| Concentrate Blood Products | ) | |
| Litigation | ) | 93 C 7452 |
| | ) | MDL 986 |
| _____ | ) | |

**MEMORANDUM OPINION**
*(Ruling on Motion for Class Certification)*

The court has under advisement the motion of the "second generation" of plaintiffs in this multidistrict litigation to certify a class pursuant to Fed. R. Civ. P. 23(c)(4)(A) for the trial of particular issues the resolution of which plaintiffs believe will facilitate the further handling of the litigation.[1]

To understand the questions presented, it is necessary to refer to the proceedings in the "first generation" cases, which are no longer pending.[2]   We assume familiarity with our opinion

---

[1]   The second generation of plaintiffs are residents of foreign countries (mostly in Europe and South America) who claim to have contracted HIV and/or the Hepatitis C virus ("HCV") from the use of defendants' factor concentrates distributed in plaintiffs' home countries.  Unlike the first generation claims, which centered on ordinary negligence, the second generation claims are based upon an allegation that, after defendants knew their factor concentrates could transmit viruses, and that heat treatment would substantially reduce the risk of viral contamination, they nonetheless sold untreated product on the foreign markets.  Thus, the gravamen of the second generation claims is not negligence but fraud and other intentional misconduct.  The cases were filed in several federal districts and transferred here as part of the original MDL-986, designated "Second Generation."

[2]   Those cases were ultimately settled, and the settlement was affirmed. In Re Factor VIII or IX Concentrate Blood Prod. Litig., 159 F.3d 1016 (7th Cir. 1998).

certifying a negligence class, <u>Wadleigh v. Rhone-Poulenc Rorer, Inc.</u>, 157 F.R.D. 410 (N.D. Ill. 1994), and the opinion of the Seventh Circuit issuing a writ of mandamus to decertify the class, <u>In re Rhone-Poulenc Rorer Inc.</u>, 51 F.3d 1293 (7th Cir. 1995) ("<u>R.P.R.</u>").  The ultimate question presented by the present motion is whether the particular issues proposed by the plaintiffs can properly be certified for trial in light of the Seventh Circuit's ruling, which, of course, is the law of the case.

There were three reasons why the Court of Appeals found our class certification of the negligence issue to have been an abuse of discretion.  The first reason was the Court's "concern with forcing these defendants to stake their companies on the outcome of a single jury trial, or be forced by fear of the risk of bankruptcy to settle even if they have no legal liability, when it is entirely feasible to allow a final, authoritative determination of their liability ... to emerge from a decentralized process of multiple trials" <u>R.P.R.</u>, 51 F.3d at 1299.  The Court referred with apparent approval to the fact that "Judge Friendly, who was not given to hyperbole, called settlements induced by a small probability of an immense judgment in a class action 'blackmail settlements.'" <u>Id.</u> at 1298.

The core of our certification ruling in the first generation cases was our belief that "the definition of ordinary negligence is substantially identical in all jurisdictions."  <u>Wadleigh</u>, 157

F.R.D. at 419. Therefore, a class trial of the negligence issue (excluding issues of proximate cause and damages) would be dispositive of the negligence claim if defendants prevailed and useable collaterally in other jurisdictions in the event of a plaintiffs' verdict. We noted that if for any reason the verdict of the jury would not be useable for collateral purposes in a particular jurisdiction, "that would not detract from the efficiency of using the verdict in those cases and jurisdictions where it would be entitled to collateral effect." Id. at 426.

The Court of Appeals disagreed, giving as a second reason for its mandamus order its finding that in fact the definition of ordinary negligence differed substantially from jurisdiction to jurisdiction, so that a class verdict on the issue would be of little use in any event. R.P.R., 51 F.3d at 1300-1302. The Court remarked that, in place of individual trials, "the district judge proposes to substitute a single trial before a single jury instructed in accordance with no actual law of any jurisdiction — a jury that will receive a kind of Esperanto instruction, merging the negligence standards of the 50 states and the District of Columbia." Id. at 1300.

The third concern of the Court was what it saw as a Seventh Amendment problem, in that subsequent juries addressing the issues of comparative negligence and proximate cause would have to reexamine the negligence finding of the class jury. "Both issues

overlap the issue of the defendants' negligence." <u>Id.</u> at 1303.
As the Court explained, "the right to a jury trial in federal civil
cases, conferred by the Seventh Amendment, is a right to have
juriable issues determined by the first jury impaneled to hear them
... and not reexamined by another finder of fact." <u>Id.</u>

Plaintiffs have drafted some specific questions they believe
can be submitted to a Rule 23(c)(4)(A) class jury without violating
<u>R.P.R.</u>  Before examining those questions, we will deal with a
threshold matter raised by the defendants concerning the proper use
of Rule 23 (c)(4)(A).  They contend that before "particular issues"
can be certified under Rule 23(c)(4)(A), there must first be a
determination that the class meets the requirements of Rule
23(b)(3), including predominance of common questions of law or fact
over questions affecting only individual members of the class.
Defendants rely on the <u>Castano</u> footnote,[3] and we concede that the
footnote has gained a following.  But we are not persuaded by it.
<u>Castano</u> is not an interpretation of Rule 23(c)(4)(A) but a simple
rejection of its language that "an <u>action</u> may be brought or
maintained as a <u>class</u> <u>action</u> with respect to <u>particular</u> <u>issues</u>...."
Fed. R. Civ. P. 23 (c)(4)(A) (emphasis added).  We agree with the
interpretation found in such authorities as 7A Charles Alan Wright
& Anthony R. Miller, <u>Federal Practice and Procedure</u> § 1778 at 546
(3d. ed. 2004) which commented that "[e]ven though a court decides

---

[3]  <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d 734, 745 n.21 (5th Cir. 1996).

that the common questions do not predominate for purposes of Rule 23(b)(3) ... the court always should consider the possibility of determining particular issues on a representative basis as permitted by Rule 23(c)(4)(A)... whenever that might prove efficient and economical." See also Gunnells v. Healthplan Servs., Inc. 348 F.3d 417, 439-40 (4th Cir. 2003); Chiang v. Veneman, 385 F.3d 256, 267 (3d Cir. 2004); Robinson v. Metro-North Commuter Railroad Co., 267 F.3d 147, 167 n.12 (2d Cir. 2001); Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996); In re Tetracycline Cases, 107 F.R.D. 719, 726-27 (W.D. Mo. 1985); Emig v. Am. Tobacco Co., 184 F.R.D. 379, 395 (D. Kan. 1998).

Plaintiffs argue that a single determination of certain material facts affecting liability would be superior to hundreds of individual trials in which the same factual issues would be presented over and over again to a series of separate juries. We agree with this as a general proposition, but we must recognize that it is the same argument the Court of Appeals rejected in R.P.R. Plaintiffs realize the problem, but are confident their plan would not run afoul of R.P.R. We asked them to draft, in support of their motion, a list of ten questions that would be strictly factual, would not involve any legal component and would, if decided by a jury, materially advance the litigation.

Plaintiffs filed a brief that included their proposed ten questions; defendants filed a response, criticizing each of the

questions; plaintiffs filed a reply containing another set of the ten questions they thought were responsive to defendants' criticisms; defendants filed a surreply and finally, plaintiffs filed an additional response.

When plaintiffs submitted their revised set of ten questions, they did not withdraw the original set. They left it up to the court to decide which, in each instance, is the better question.

The parties are in agreement that for a Rule 23(c)(4)(A) class to be certified, there must first be compliance with the basic requirements of Rule 23(a) — numerosity, commonality, typicality and adequacy of representation. See Fed. R. Civ. P. 23(a). Defendants do not argue numerosity, but they contest every other element of Rule 23(a), contending that there are no questions of law or fact common to the class, that the claims of the representative parties are not typical of the putative class and that the representative parties will not adequately protect the interests of the class. Plaintiffs dispute each of defendants' contentions and argue that the class clearly meets each of the Rule 23(a) requirements.

Even if plaintiffs are correct as to their compliance with Rule 23(a), the ultimate question on their certification motion is whether their proposed Rule 23(c)(4)(A) class would pass muster under R.P.R. We therefore proceed to that question and defer the matter of Rule 23(a) compliance.

## Discussion

These are the particular issue questions plaintiffs have submitted.

## Question #1

*By what date did Defendant ___ know that HT factor concentrate products were significantly less likely to transmit AIDS than non-HT products?*

*[Original Version]  By what date did Defendant know that heat-treated (HT) factor concentrate products were significantly safer than non-HT products with respect to the risk of transmission of [the agent that causes] AIDS?*

Both versions of the question suffer from the fact that "significantly" calls for a determination according to some legal standard, probably a negligence standard.  It would bring into play concepts of foreseeability and causation as well as legal duty. For instance, what if the jury were to find that HT concentrate was 1% less likely to transmit the virus?  Would this be "significantly less likely?"  Would HT concentrate be "significantly safer than non-HT products?"  The jury would have to be told what standard determines "significance" of a risk, and that is a matter which would vary with the jurisdiction.

Neither version of question number one is usable as submitted. They each contain too much "legal overlay," a phrase used by plaintiffs in one of their briefs which seems an apt description of the problem.

## Question #2

*By what date could Defendant ___ have developed and used a treatment process to make its factor concentrate products significantly less likely to transmit viruses?*

*[Original version] By what date could Defendant_____ have developed and used a heat-treatment process in the manufacture of factor concentrate products that was effective in reducing the risk of transmitting viral infectious agents?*

_____Both versions of this question ask what defendant "could" have done, another question that could only be answered by reference to some legal standard, probably ordinary care. What if defendant could have developed the process only by having extraordinary foresight as to the need for it and using extraordinary ingenuity in developing it? Is that what is meant by "could?" Or does "could" imply a more forgiving standard? The jury would have to be told something about the degree of care the law requires, and this would hinge on the issue of foreseeability. This "legal overlay" would vary from state to state, according to the holding of R.P.R., and the question is therefore unsatisfactory.

It is true that the original version of the question did not use "significantly less likely," but rather, referred to a process that was "effective in reducing the risk." But what does "effective" mean? Reducing the risk by 10%? Or would it have to be by more than 50%? The word would have to be defined, or, better yet, a more concrete question would have to be devised. The same problem affects the word "reducing." Reducing by how much?

Question number 2 is not usable.

## **Question #3**

*By what date could Defendant ___ have developed and used a Solvent Detergent (SD) process to make its factor concentrate products significantly less likely to transmit HCV?*

*[Original version] By what date could Defendant_____ have developed and used a Solvent Detergent (SD) process in the manufacture of its factor concentrate products that was effective in reducing the risk of transmitting viral infectious agents?*

_____The problems are identical to those we found in questions 1

and 2, and question 3 is therefore not useable.

## **Question #4**

*By what date did Defendant ___ know that a SD process could be used to manufacture factor concentrate products that were significantly less likely to transmit lipid viruses, including HCV?*

*[Original version] By what date did Defendant _____ know that SD processes significantly reduced or eliminated the risk of the transmission of lipid viruses, including HCV, in factor concentrate products?*

_____The same legal overlay problems prevent the use of this

question.

## **Question # 5**

*Did Defendant ___ manufacture factor concentrate products from pooled plasma obtained from donors who this Defendant knew were significantly more likely to have a viral infection than the general population of potential available donors?*
*If yes,*
        *a. During what inclusive dates were these factor concentrate products sold?*

> b.   Did Defendant _____ know that such donors' plasma was significantly more likely to transmit infections to patients who used its factor concentrate products?
>                    Yes ____          No ____
>      c.   Should Defendant ___ have known that such donors' plasma was significantly more likely to transmit infections to patients who used its factor concentrate products?

*[Original version]   Did Defendant _____ manufacture factor concentrate products from pooled plasma obtained from donors that this Defendant knew were at significantly greater risk for viral infections than the general population of potential available donors?*

> *Yes ____                    No ____*

*If yes,*
*     a.   during what inclusive dates were the products made from such pooled plasma sold? and*
*     b.   did Defendant _____ know that such donors' plasma significantly increased the risk of transmitting infections to patients who used its factor concentrates?*
> *Yes ____          No ____*

*     c.   should Defendant ___ have known that such donors' plasma significantly increased the risk of transmitting infections to patients who used its factor concentrates?*

_____Again, the word "significantly" pervades this question and would require the court to instruct the jury in an "Esperanto" fashion that would violate <u>R.P.R.</u>

## <u>Question #6</u>

*Did Defendant ___ accurately inform people with hemophilia and their treaters about the dangers of factor concentrate products manufactured from donor pools that included high risk groups?*

*[Original version] Did Defendant _____ adequately inform or warn the medical communities in the United States and elsewhere about the relative safety of factor concentrate manufactured from donor pools that included high risk groups?*

_____The original version, asking whether the defendant "adequately" informed or warned could be answered only with reference to what would constitute "adequate," a legal question that could vary from jurisdiction to jurisdiction.

The revised version substitutes "accurately," but we agree with defendants that the question is too vague to be useful. Information could be accurate in some respects but inaccurate, (for instance, incomplete) in others, and the legal significance of the inaccuracies would usually depend upon whether they related to material matters. Simply asking whether something was not "accurate" does not do the job. The inquiry would have to be phrased in terms of whether the defendant gave notice of matters as to which, under the law of a particular jurisdiction, it was obliged to give notice (assuming it had the necessary information itself).

This question is not useable.

## **Question #7**

*By what date did Defendant _____ have reasonable evidence of an association between the use of factor concentrate products and AIDS in persons with hemophilia who used such products?*

*a. Did Defendant _____ fail accurately to inform people with hemophilia and their treaters of the association between the use of factor concentrate products and AIDS after the date specified in the answer to the previous question?*

*Yes _____ No _____*

*b. If yes, during what inclusive dates did Defendant _____ fail accurately to inform people with hemophilia and their treaters of the association between the use of factor concentrate products and AIDS?*

*[Original version]   By what date did Defendant _____have reasonable evidence of an association between infusion of blood factor concentrates and diagnosis of AIDS in persons with hemophilia who used such products?*

*a.  Did Defendant _____ fail to adequately warn of the risk of AIDS after the date specified in the answer to the previous question?*

*Yes _____                    No _____*

*b.  If yes, during what inclusive dates did Defendant _____ fail to adequately warn of the risk of AIDS?*

_____We see a number of problems in both versions of this question. "Reasonable evidence" would be "reasonable" only with reference to some duty of inquiry, which could vary among jurisdictions.  Some definition of "reasonable" would have to be given in order for the question to be answered.

Secondly, what is meant by an "association?"[4]  Again, the word would have to be defined, and the definition would involve the substantive law of some jurisdiction.

The original question uses the word "adequately," and the subparts of the revised question use the word "accurately," both of which are problematic as we have indicated above.

Question number 7 is not useable.

---

[4]   We recall the position of the tobacco companies years ago that the statistics on smoking and cancer showed merely an "association," not a causal relationship.

## Question #8

*Did Defendant _____ make statements that it knew were false, or fail to disclose important information that it knew was true, concerning the likelihood of viral transmission by untreated factor concentrate products manufactured by Defendants in comparison to any of the following alternative treatments:*

*HT factor concentrate products*      *Yes* ____      *No* ____

*SD-treated factor concentrate products*      *Yes* ____   *No* ____

*cryoprecipitate*      *Yes* ____      *No* ____

*factor concentrate products made with plasma from non-U.S. sources*      *Yes* ____   *No* ____

*If the answer is "yes" to any of the above, during what inclusive dates did such false statements and/or failures to disclose occur?*

*[Original version] Did Defendant _____ misrepresent or conceal the risk of viral transmission by untreated concentrate products manufactured by Defendants in comparison to any of the following alternative treatments: [see list of treatments in Supplemental Memorandum]*

_____ The revised version is too vague to be suitable for a special interrogatory. Reference to "statements," without describing the specific statements alleged by plaintiffs to have been false, and "important information," without specifying the information, would leave the jury adrift and deprive its answer to the question of any collateral value. There would be no way of knowing what "information" or which "statements" were the basis of the verdict.

The original version is actually somewhat better, in that it identifies the information allegedly misrepresented or concealed. However, it is still unsatisfactory in that it fails to define the

"risk" that is contemplated by the question. For the question to be material, the risk would have to be great enough to trigger a legal duty, and how great is that? We think the jury would have to be told what they are looking for in terms of the quantum of risk, and that would involve a matter of substantive law.

Question number 8 is not useful.

### ***Question #9***
*(No revisions)*

*Did Defendant _____ agree with any other defendant to act together to:*
*a. keep untreated concentrated blood products on the market after Defendant _____ knew of the risk that such products transmitted HIV?*

*Yes ____ No ____*

*b. avoid recalls of such products? Yes ____ No ____*

*c. engage in "delaying tactics" with regard to implementation of steps to reduce the risk of HIV contamination of the products?*

*Yes ____ No ____*

*d. refuse to warn of the risk of transmission of HIV by concentrated blood products? Yes ____ No ____*

*e. If the answer is "yes" to any of the above,*

*When did Defendant _____ make this agreement?*

*During what inclusive dates did Defendant _____ engage in this conduct?*

_____The introductory phrase, "[d]id the defendant _____ agree with any other defendant" has the surface appearance of simplicity, but it is not so simple. The question is addressed to the issue of conspiracy, and what is meant by an "agreement" under

the law of conspiracy would have to be defined for the jury in order for their answers to the question to be meaningful. Express agreement is not required in any jurisdiction we are aware of, and a conspiracy is ordinarily proved by circumstantial evidence. The jury would have to be given the law on this point in order to understand the question. Defendants argue that the law of conspiracy differs from jurisdiction to jurisdiction, and, while we are not persuaded by their argument, we were similarly unpersuaded about their argument concerning "negligence" ten years ago. We think it likely that the Seventh Circuit would find a particular issue question addressed to whether the defendants "agreed" to something to be a question that would not lead to a collaterally useful answer.

The subparts of the question use some of the words and phrases we have found troublesome in the preceding questions: "knew of the risk;" "reduce the risk;" "warn of the risk."

Question number 9 is not useable.

## Question #10

*Did Defendant _____ continue to ship untreated factor concentrate products:*
   *a. after it was able to produce HT-treated factor concentrate products?*          *Yes_____*          *No_____*

   *If yes, during what inclusive dates? _____*

   *b. after it was able to produce SD-treated factor concentrate products?*          *Y e s _ _ _ _ _*
          *No_____*

*If yes, during what inclusive dates?* _____

*c. after it began to sell HT-treated factor concentrate products anywhere in the world?*

                        *Yes_____*                       *No_____*

*If yes, during what inclusive dates?* _____

*d. after it began to sell SD-treated factor concentrate products anywhere in the world?*
*e. after it started to ship HT- or SD-treated factor concentrate products to each foreign country?*

                        *Yes_____*                       *No_____*

*If yes, for how long?*_____

*Did Defendant* _____ *continue to ship untreated factor concentrate:*
    *a. after it was able to produce HT- or SD-treated factor concentrate?*

                        *Yes_____*                       *No_____*

*If yes, for how long?*_____

*b. after it began to sell HT- or SD-treated factor concentrate anywhere in the world?*

                        *Yes_____*                       *No_____*

*If yes, for how long?*_____

*c. after it started to ship HT- or SD-treated factor concentrate to each foreign country?*

                        *Yes_____*                       *No_____*

*If yes, for how long?*_____

*[Original version]*

*d. If the answer to any of the above is "yes", did the conduct of Defendant* _____

        *i. show an indifference to or a reckless disregard of the health or safety of others?*

                    *Yes_____*                   *No_____*

*ii. involve repeated actions?*

*Yes*_____                              *No*_____

*iii. involve intentional trickery, malice, or deceit?*

*Yes*_____                              *No*_____

_____We agree with defendants that subparagraph (d) of the original version implicates substantive legal questions and would therefore be impermissible under <u>R.P.R.</u>  Plaintiffs acknowledge there may be merit to the argument and their revised version omits subparagraph (d).

What we have left, however, seems unlikely to be a question that would materially advance the litigation.  The various subdivisions have to do with whether a defendant sold non-treated concentrate after it was "able" to produce, or in fact did produce, treated concentrate and whether it continued to ship untreated concentrate after it began selling treated concentrate.  These questions are certainly material to plaintiffs' case, in that they relate directly to their allegation that defendants "dumped" untreated concentrate, but we doubt that the questions, standing alone, are concerned with matters that are truly in dispute.  It is hard to believe that there will be a factual disagreement about when each defendant began manufacturing treated concentrate and when it ceased shipping untreated concentrate.  We realize this is

a subject of the ongoing MDL discovery, but we anticipate that the result will be substantial agreement.

In any event, submitting question 10 to a Rule 23(c)(4)(A) jury would not yield an answer to the major question of what the defendant <u>knew</u> at the times in question when it was distributing untreated and treated concentrate. A jury determination that a defendant shipped untreated concentrate after it was "able" to produce treated concentrate, or in fact shipped treated concentrate, would not establish that defendant knew the distribution of untreated concentrate was a dangerous practice. A subsequent jury would have to undertake that inquiry quite apart from any determination of the class jury in regard to dates. What would be needed, in order to flesh out question 10 and make it useful collaterally, would be a companion question about what the defendant knew at the times in question. A class jury's answer to that question, spliced to their answers to the timing questions, could have a major impact on the case. If the answers indicated that a defendant began treating its concentrate in an effort to avoid HIV contamination, but nonetheless continued to sell untreated concentrate derived from the same kinds of sources, those findings would obviously be relevant to the determinations of a subsequent jury. On the other hand, should the findings of the class jury favor the defendant on these issues, the defendant would

be in a position to argue for a judgment in its favor as to all members of the class.

We think it would be possible to draft such a "knowledge" question to go along with portions of question 10, and thereby create useful issues for a class jury that would not violate either the Esperanto or Seventh Amendment aspects of <u>R.P.R.</u>  There is a passage in <u>R.P.R.</u> that we find instructive in this regard.  In discussing the desirability of individual trials as opposed to a class trial of particular issues, the Court stated:

> If in the course of individual litigations by HIV-positive hemophiliacs juries render special verdicts that contain findings <u>which do not depend on the differing state standards of negligence</u> – for example a finding concerning the date at which one or more of the defendants learned of the danger of HIV contamination of the blood supply – these findings may be given collateral estoppel effect in other lawsuits, at least in states that allow "offensive" use of collateral estoppel.  In that way the essential purpose of the class action crafted by Judge Grady will be accomplished.

<u>R.P.R.</u> 51 F.3d at 1302 (emphasis added).  The Court was not proposing the exact phrasing of an acceptable special verdict, but neither did it indicate any unease about the language it used.  It had no trouble with "learned" or "danger," and we think the remarks of the Court are a basis for confidence that a suitable question concerning knowledge — that would not depend upon the different laws of different jurisdictions — could be drafted.  We have suggested "know," whereas the quoted passage from <u>R.P.R.</u> uses "learned."  We think the two are interchangeable, but, to be on the

safe side, a special verdict could be drafted using the exact language of R.P.R., inquiring as to when a defendant "learned of the danger of HIV contamination." We will not take the time to draft such a verdict, however, because there is a larger problem that overhangs this discussion.

*    *    *    *    *

Assuming that a slightly reworked question number 10, combined with a strictly factual question concerning defendants' knowledge, could be submitted to a class jury without violating the Esperanto and Seventh Amendment aspects of R.P.R., we would have a special verdict with potential class-wide significance, regardless of which way the jury answered the questions. But that very potential brings us to the first reason given by the majority in R.P.R. for its mandamus order — the undue pressure the class trial would bring upon the defendants to settle the individual claims.

It is true that the Court emphasized the "great likelihood that the plaintiffs' claims, despite their human appeal, lack legal merit. This is the inference from the defendants' having won 92.3 percent (12/13) of the cases to have gone to judgment." Id. at 1299. The Court indicated that this was part of the reason for its refusal  to allow a class jury:

> This jury, jury number fourteen, may disagree with twelve
> of the previous thirteen juries – and hurl the industry
> into bankruptcy.  That kind of thing can happen in our
> system of civil justice (it is not likely to happen,
> because the industry is likely is settle – whether or not

it really is liable) without violating anyone's legal
rights.

Id. at 1300.  In this passage, the Court is saying that the Rule
23(c)(4)(A) certification itself would force the settlement even
before the class trial were held.  The mere prospect of a
plaintiffs' verdict in the Rule 23(c)(4)(A) trial would exert the
influence.

The final question, then, is whether there could be a Rule
23(c)(4)(A) certification in this case that would not violate the
"undue pressure" holding of R.P.R.  We think the answer is probably
no.  It is true that, unlike the first generation negligence cases,
there has been no series of defense victories in individual cases
that would indicate a weakness in plaintiffs' position.  As far as
we know, there has been no verdict of any kind in the second
generation cases.  But we do not read R.P.R. as limited to the
situation where the proposed plaintiff class has a weak position on
the merits of the litigation.  In fact, the logic of the "undue
pressure" argument is even stronger where plaintiffs have a strong
case on liability: the prospect of a plaintiffs' verdict in the
(c)(4)(A) trial would be greater, and therefore the pressure on
defendants to settle rather than go to trial would be stronger.

It is our duty to apply R.P.R. as we understand it.  The
result is that we must deny the certification motion on the ground

that, under <u>R.P.R.,</u> certification would place undue settlement pressure on the defendants.[5]

## **<u>CONCLUSION</u>**

Plaintiffs' Motion to Certify a Class Pursuant to Fed. R. Civ. P. 23(b)(3) and 23(c)(4)(A) for the Trial of Certain Particular Issues is denied.

DATED:     March 1, 2005

ENTER:     _____

John F. Grady, United States District Judge

---

[5]/  Pursuant to the new Rule 23(f), plaintiffs have the opportunity to seek leave to appeal this ruling.  <u>See</u> Fed. R. Civ. P. 23(f).