**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE FACTOR VIII OR IX | ) | MDL 986 |
| CONCENTRATE BLOOD PRODUCTS | ) | |
| LIABILITY LITIGATION | ) | 93 C 7452 |
| | ) | |
| ---------------------------------- | ) | |
| | ) | |
| DOMENICO GULLONE, et al., | ) | |
| | ) | This document relates to: |
| Plaintiffs, | ) | |
| | ) | 1:03-CV-8928 |
| v. | ) | |
| | ) | |
| BAYER CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

The basic issue presently before the court in this multidistrict litigation is whether we should grant the defendants' motion to dismiss one of the constituent cases pursuant to the doctrine of *forum non conveniens*. The plaintiffs in the case of Gullone v. Bayer Corp., transferred here from the Northern District of California for pretrial proceedings, are six citizens and residents of Italy, one citizen and resident of Germany, and eight citizens and residents of the United Kingdom ("U.K."). All of the plaintiffs in the MDL are persons who allege that they contracted either the HIV virus or the Hepatitis B virus by exposure, either directly or indirectly, to blood-clotting products manufactured by

the four defendants for use by persons suffering from hemophilia. The plaintiffs are either hemophiliacs who allegedly used the products or spouses who allege infection as a result of the spousal relationship. The defendants are Bayer Corporation, an Indiana corporation, Baxter Healthcare Corporation, a Delaware corporation, Armour Pharmaceutical Company, Inc., a Delaware corporation, and Alpha Therapeutic Corporation, a California corporation. Jurisdiction is based upon diversity of citizenship.

The Judicial Panel on Multidistrict Litigation has transferred a number of cases, including Gullone, to this district for pretrial proceedings. In addition, several similar cases have been filed in this district and are being treated as part of the multidistrict litigation.

The cases now pending are actually the "second generation" of this consolidated litigation and have been so labeled by the MDL Panel. The "first generation" cases were resolved some years ago, most of them by way of a class settlement of approximately 6000 claims.[1]

A discussion of the first generation claims is necessary to an analysis of the present *forum non conveniens* motion. For convenience, we will quote from one of our opinions regarding those earlier cases:

> Plaintiffs in these consolidated cases are persons suffering from hemophilia, a hereditary disease in which the protein that causes blood clotting is missing. The principal treatment for the disease is the intravenous

---

[1] See In re Factor VIII or IX Concentrate Blood Prods. Litig., 159 F.3d 1016 (7th Cir. 1998) (approving settlement).

injection of the missing protein, derived from the plasma of blood donors. Four of the defendants are pharmaceutical companies which collect and process the plasma to derive "factor concentrates," which are then sold for use by hemophiliacs. The manufacturing process for deriving the finished factor concentrate from blood plasma is known as "fractionating," and the four defendants involved in the present dispute are known as "fractionators."*  Together, they produce all or virtually all of the factor concentrates used in the United States.

In the early 1980s, some hemophiliacs using the defendants' factor concentrates began to show symptoms of a disease later identified as Acquired Immune Deficiency Syndrome ("AIDS").  As is now known, this disease is transmitted by the Human Immunodeficiency Virus ("HIV"). Plaintiffs allege that they were infected with the virus as a result of injecting the defendants' factor concentrates derived from donors who were themselves infected.  Plaintiffs allege a variety of negligent acts and omissions on the part of the fractionator defendants, principally the failure to sterilize their products to eliminate the possibility of viral infection (viral inactivation), failure to screen plasma donors so as to eliminate classes of persons, such as intravenous drug users, who presented a high risk of viral infectivity, failure to engage in "surrogate testing" of donors to determine whether they had viral infections (such as hepatitis) suggesting the possibility of other, undetectable viruses as well,  failure to warn users of their products of the danger of infection once they knew or reasonably should have known that the newly observed symptoms were caused by a disease that was viral and blood-borne, and failure to withdraw their products from the market when the danger of infection became known.

---------

* The four fractionator defendants are Baxter Healthcare Corporation, Bayer Corporation, Alpha Therapeutic Corporation and Armour Pharmaceutical Company.

Defendants have a variety of defenses to plaintiffs' negligence allegations. Among the more important are that the virus in question was unknown and unforeseeable during any period of time defendants were not taking the precautions plaintiffs claim they should have been taking and that, as soon as the presence of a new virus became apparent, they did all they reasonably could have done to eliminate it from their products. With regard to each of the measures plaintiffs allege should have been undertaken earlier, defendants respond with specific reasons as to why it was not feasible to do so. For instance, heat treatment of the concentrates, the method of viral inactivation plaintiffs claim should have been used, was not, in defendants' view, a procedure that was technologically effective or even legally permissible for them to use until most of the plaintiffs had already been infected with the virus. Defendants contend that they began the effective heat treatment of their products as soon as they were able to do so.

A number of lawsuits based upon diversity of citizenship were filed against the fractionators in various federal districts by infected hemophiliacs, their spouses, guardians, and personal representatives. On December 7, 1993, the Judicial Panel on Multidistrict Litigation transferred the then pending federal cases to this court for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. The total number of cases now pending, including tag-a-longs, is approximately 192. Another 300 similar cases are pending in various state courts. A Steering Committee appointed by the court, chosen from among the attorneys who represent plaintiffs in individual cases, has been conducting the litigation on behalf of all plaintiffs.

Prior to the MDL consolidation, thirteen cases were tried to verdict in state and federal courts. Twelve verdicts were for defendants and the lone plaintiffs' victory was reversed on appeal. No cases have been tried subsequent to the MDL consolidation.

Not long after the MDL consolidation, plaintiffs moved for nationwide class certification in one of the cases, contending that the claims of the plaintiffs were typical of thousands of claims which had accrued to infected hemophiliacs across the country. We declined to certify all issues for class treatment, but did decide that certification of the negligence issues was appropriate pursuant to Rule 23(c)(4)(A) of the Federal Rules of Civil Procedure. Wadleigh v. Rhone-Poulenc Rorer, Inc., 157 F.R.D. 410 (N.D. Ill. 1994). We were of the view that trial of the class action would effectively decide

the litigation one way or the other, and therefore directed the parties to concentrate on preparing for trial of the class action. This concentration was consistent with the purpose of the MDL, inasmuch as the common issues which would have been tried in <u>Wadleigh</u> were identical to the common issues that prompted the MDL consolidation. However, <u>Wadleigh</u> was not to be tried, at least as a class action. Defendants had opposed class certification, and on a petition for a writ of mandamus, obtained a ruling from the Court of Appeals that class treatment was not appropriate. <u>Matter of Rhone-Poulenc Rorer, Inc</u>., 51 F.3d 1293 (7th Cir.), <u>cert</u>. <u>denied</u>, 516 U.S. 867, 116 S.Ct. 184, 133 L. Ed. 2d 122 (1995). Pursuant to the writ, we decertified the class.

<u>In re Factor VIII or IX Concentrate Blood Prods. Litig.</u>, 169 F.R.D. 632, 633-34 (N.D. Ill. 1996).

Following decertification of the class, the parties continued with core discovery, taking numerous depositions throughout the country and amassing millions of documents, which became part of the plaintiffs' document depository. The discovery was almost entirely related to plaintiffs' claims of negligence on the part of the four defendants. Discovery continued even beyond our approval of the class settlement, because a number of plaintiffs opted out of the settlement.[2] However, prior to approving the settlement we were assured by class counsel that no discovery necessary to an intelligent evaluation of defendants' settlement offer remained to be done, and we were satisfied that this was true.

Once the settlement process was complete, the question arose as to what to do with the enormous document depository, which

---

[2] Almost all of them joined in the settlement during the lengthy claims process that followed approval by the Seventh Circuit.

included not only documents but transcripts of the depositions.  We decided that the depository should be retained because of the possibility that further claims might surface, and defendants agreed to take over custody.  It has remained intact to the present time.

## **The Second Generation**

Beginning in 2004, cases were filed in several federal districts by citizens of various foreign counties, charging the same four defendants with the same negligent conduct alleged in the first generation cases and charging in addition that the defendants, after becoming fully aware of the risk of viral contamination involved in their untreated concentrates, fraudulently concealed that risk and "dumped" their untreated products on unsuspecting foreign markets.  These new plaintiffs, like those in the first generation cases, are hemophiliacs who allege that they were infected with HIV or Hepatitis B as a result of using, or of their spouses' using, defendants' contaminated concentrates.  They are citizens of Argentina, Austria, Brazil, Chile, Colombia, Denmark, Germany, Honduras, Hong Kong, Israel, Italy, Luxembourg, New Zealand, Norway, Panama, Paraguay, Peru, South Africa, Taiwan, and Venezuela, as well as the United Kingdom and the United States.

Plaintiffs' lead counsel who handled the first generation cases has withdrawn, and new lead counsel has been appointed.  The

transferor districts up to this point are the Northern District of California, the Central District of California, the Southern District of Florida, and the Northern District of Texas.

## The *Forum Non Conveniens* Motion

The defendants have indicated that they believe all of the foreign claims should be dismissed because of *forum non conveniens*. As will be seen, the *forum non conveniens* analysis depends largely upon the particular alternative forum being proposed. It will be necessary, therefore, to give individual consideration to each of the proposed alternative forums. We gave the defendants the option of electing where to begin, and they have chosen the United Kingdom.

## The Law of *Forum Non Conveniens*

In <u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. 501 (1947), a diversity case, the Supreme Court began its analysis by observing:

> It is conceded that the venue statutes of the United States permitted the plaintiff to commence his action in the Southern District of New York and empower that court to entertain it. But that does not settle the question whether it must do so. Indeed the doctrine of forum non conveniens can never apply if there is an absence of jurisdiction or mistake of venue.

> This Court, in one form of words or another, has repeatedly recognized the existence of the power to decline jurisdiction in exceptional circumstances.

<u>Id.</u> at 504 (footnote omitted). The Court went on to discuss the factors that will usually be relevant to the decision:

> Wisely, it has not been attempted to catalogue the circumstances which will justify or require either grant

or denial of remedy.  The doctrine leaves much to the discretion of the court to which plaintiff resorts, and experience has not shown a judicial tendency to renounce one's own jurisdiction so strong as to result in many abuses.

If the combination and weight of factors requisite to given results are difficult to forecast or state, those to be considered are not difficult to name.  An interest to be considered, and the one likely to be most pressed, is the private interest of the litigant.  Important considerations are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.  There may also be questions as to the enforcibility of a judgment if one is obtained. The court will weigh relative advantages and obstacles to fair trial.

Id. at 508 (footnote omitted).  In addition to the private interests of the parties, the public interest is also relevant:

Factors of public interest also have place in applying the doctrine.  Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation.  In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only.  There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

Id. at 508-09.  The holding of Gilbert was that the trial judge had properly dismissed the action filed in the Southern District of New

York because the Western District of Virginia was clearly a more convenient forum. The plaintiff resided there, all of the events involved in the case took place there, and most of the witnesses resided there. In addition, a possible third-party defendant not subject to suit in New York was domiciled in the Virginia district. See Id. at 509, 511.

In a later case, Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981), the Court dealt with a question not presented in Gilbert — whether the proposed alternative forum provided an adequate remedy. Suit had been brought against the defendant airplane manufacturer by citizens of Scotland in California state court for deaths and injuries arising out of an airplane crash that had occurred in Scotland. The case was removed to federal court, where it was ultimately dismissed on the ground of *forum non conveniens*. The decision was reversed by the Court of Appeals on the basis that the law of the Scottish forum was less favorable than the law of the American forum. The Supreme Court reversed the Court of Appeals, observing that:

> Except for the court below, every Federal Court of Appeals that has considered this question after Gilbert has held that dismissal on grounds of *forum non conveniens* may be granted even though the law applicable in the alternative forum is less favorable to the plaintiff's chance of recovery.

Id. at 250. The court went on to discuss one of the "practical" problems with the approach taken by the Court of Appeals:

The Court of Appeals' approach is not only inconsistent
with the purpose of the *forum non conveniens* doctrine,
but also poses substantial practical problems.  If the
possibility of a change in law were given substantial
weight, deciding motions to dismiss on the ground of
*forum non conveniens* would become quite difficult.
Choice-of-law analysis would become extremely important,
and the courts would frequently be required to interpret
the law of foreign jurisdictions.  First, the trial court
would have to determine what law would apply if the case
were tried in the chosen forum, and what law would apply
if the case were tried in the alternative forum.   It
would then have to compare the rights, remedies, and
procedures available under the law that would be applied
in each forum.   Dismissal would be appropriate only if
the court concluded that the law applied by the
alternative forum is as favorable to the plaintiff as
that of the chosen forum.   The doctrine of *forum non
conveniens*, however, is designed in part to help courts
avoid conducting complex exercises in comparative law.
As we stated in <u>Gilbert</u>, the public interest factors
point towards dismissal where the court would be required
to "untangle problems in conflict of laws, and in law
foreign to itself."

<u>Id.</u> at 251.

The Court discussed what it meant by an adequate alternative

forum:

We do not hold that the possibility of an unfavorable
change in law should *never* be a relevant consideration in
a *forum non conveniens* inquiry. Of course, if the remedy
provided by the alternative forum is so clearly
inadequate or unsatisfactory that it is no remedy at all,
the unfavorable change in law may be given substantial
weight; the district court may conclude that dismissal
would not be in the interests of justice.

<u>Id.</u> at 254.   This statement is not altogether clear to us.  If a

remedy is "no remedy at all," we wonder why the difference should

be given not just "substantial weight" but dispositive weight. In a footnote, the Court indicated that

> dismissal would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute. Cf. Phoenix Canada Oil Co. Ltd. v. Texaco, Inc., 78 F.R.D. 445 (Del. 1978) (court refuses to dismiss, where alternative forum is Ecuador, it is unclear whether Ecuadorean tribunal will hear the case, and there is no generally codified Ecuadorean legal remedy for the unjust enrichment and tort claims asserted).

Id. at n.22. The Court held that the remedy afforded by the Scottish courts was not inadequate because "[a]lthough the relatives of the decedents may not be able to rely on a strict liability theory, and although their potential damages award may be smaller, there is no danger that they will be deprived of any remedy or treated unfairly." Id. at 255. Our Court of Appeals has interpreted this language to mean that "[a]n alternative forum is adequate when the parties will not be deprived of all remedies or treated unfairly." Kamel v. Hill-Rom Co., 108 F.3d 799, 803 (7th Cir. 1997).

### Availability of the U.K. Forum

As the Seventh Circuit noted in Kamel, the first step in a forum non conveniens inquiry is to determine whether the proposed alternative forum is "available." 108 F.3d at 803. "An alternative forum is available if all parties are amenable to process and within the forum's jurisdiction." Id. at 803. Here, the U.K. forum is available only because all of the defendants have

stipulated that they will consent to its jurisdiction.[3]  The U.K.
courts will accept such a consent to jurisdiction, according to the
affidavit of Nicholas Underhill, defendants' expert on English
law.[4]  This is a sufficient demonstration of the availability of
the U.K. forum.  <u>Id.</u> at 803.

### Adequacy of the U.K. Forum

In <u>Kamel</u>, the court quoted with approval the following
language from an opinion of the Ninth Circuit:

> A court may dismiss on *forum non conveniens* grounds even
> though the foreign forum does not provide the same range
> of remedies as are available in the home forum. However,
> the alternative forum must provide some potential avenue
> for redress.

108 F.3d at 803 (quoting <u>Ceramic Corp. of Am. v. Inka Mar. Corp.</u>,
1 F.3d 947, 949 (9th Cir. 1993)).  In his affidavit, the defendants'
expert, Nicholas Underhill, states that he has been involved as
leading defense counsel in the two principal product liability
cases brought in the U.K. in the last few years.  In one of them,
he represented the English and Welsh health authorities "who were
sued by haemophiliacs who had been infected with HIV as a result of

---

[3]  "As a condition of dismissal, defendants will agree to accept service
in actions brought by plaintiffs in a court of the U.K., so long as plaintiffs
file such actions within 90 days of this court's order dismissing the action."
(Defendants' Mem. in Support of Motion to Dismiss on *Forum Non Conveniens* at 4.)

[4]  The parties have filed the affidavits of four experienced British
barristers to support their positions regarding the adequacy of the U.K. forum.
Defendants have filed the affidavit of Mr. Underhill and plaintiffs have filed
the affidavits of Professor Adrian Briggs and Messrs. Mark Mildred and Daniel
McClean.

their treatment with Factor VIII." (Underhill Aff., ¶ 2, Ex. E to Defendants' Exs. to Motion to Dismiss.)  Commenting on whether the _Gullone_ complaint would be cognizable in the U.K. courts, Mr. Underhill states:

> I have no doubt whatever (subject to the particular points made below) that the facts alleged by the plaintiffs in the Complaint establish a clear basis for pursuing an action in an English Court.  The Court would be likely, for the reasons given below, to reach its conclusion straightforwardly on the basis of negligence rather than any of the alternative theories pleaded; but that fact would make no difference to the substantive remedy.

(_Id._ ¶ 5.)

The "particular points made below" include the fact that there is no English case that has adjudicated the question of whether spouses infected with HIV through sexual relations with their husbands can recover.  "However, I think it very likely that a cause of action would be recognised."  (_Id._ ¶ 8.)

Mr. Underhill also states (_id._ ¶ 9) that it will be necessary for each plaintiff to allege and prove which defendant's concentrate was responsible for his infection.  This is a reference to the "but for" problem discussed by the parties in their briefs, and we will discuss it at some length in this opinion.  The fact that, in Mr. Underhill's opinion, an action for fraud in addition to negligence would not be practical, does not make the U.K. forum inadequate.  Neither does the fact that damages in the U.K. are

"purely compensatory" and are set by a judge, not a jury. "Awards in cases of serious injury frequently run into many millions of pounds." (Id. ¶ 16.)

One of plaintiffs' affiants, Professor Adrian Briggs, discusses at length whether the cause of action would be deemed to have arisen in the United States, where the concentrates were manufactured, or in the U.K., where they were distributed and caused injury, and expresses uncertainty as to what substantive law would apply if the case were brought in the U.K. We find his discussion difficult to follow, and it does not undermine our belief that Mr. Underhill is correct in his opinion that a viable negligence action would lie in the U.K.

Another of plaintiffs' affiants, Mark Mildred, was Mr. Underhill's counterpart in the English blood products cases, serving as one of the three solicitors who coordinated the plaintiffs' case in the HIV litigation. (Mildred Aff. ¶ 5.) Mr. Mildred raises two issues that could have a substantial impact on the adequacy of the U.K. forum. The first is the same question of proof of causation that was raised by Mr. Underhill. Until recently, it has been necessary for a plaintiff suing in the English courts to prove that his injury was caused by the defendant he has sued. It was not enough to show that the defendant was one of several possible causes of his injury. There was nothing in England comparable to the market share or alternative liability

theories recognized in some American jurisdictions. Mr. Mildred points out that no suits have ever been brought in English courts against the manufacturers of blood products. "The reason is simple: any such proceedings would have been doomed to failure for lack of proof of causation ...." (Id. ¶ 6.)

Mr. Mildred goes on, however, to point out that "[t]he House of Lords made a limited exception to this principle in Fairchild v. Glenhaven Funeral Services Ltd. [2002] UKHL 22, by allowing recovery where the plaintiff was unable to say by the negligence of which of his several employers he was exposed to the actual asbestos fibre that caused him to go on to suffer mesothelioma." (Id. ¶ 14.) Mr. Mildred expresses uncertainty as to what kinds of situations might fall within the Fairchild exception and implies that it might not apply to the Gullone plaintiffs. However, he offers no reason why it would not apply.

As part of our adequacy analysis, we must determine how likely it is that the plaintiffs would come within Fairchild.

We will begin with an explanation of why the causation problem exists. The Gullone complaint does not specify which plaintiff was infected by the concentrate of which defendant. It alleges, rather, that the plaintiffs were infected by the concentrates of the defendants. This is because, with the exception of a plaintiff who used nothing but the concentrate of one fractionator, a plaintiff simply does not know when he was infected and by what

particular infusion of concentrate.  Hemophiliacs are likely to use more than one brand of concentrate over time, depending upon which brand the supplier has in stock.  The infection is caused by a single contaminated infusion and is not aggravated by subsequent infusions.  The problem is further complicated by the fact that the virus may not appear in the blood of the infected person until many years after the infusion that caused the infection.

The Fairchild case involved three plaintiffs who contracted mesothelioma, fatal lung disease, at some unknown time during their employments by a series of employers who negligently permitted them to be exposed to asbestos dust and fibers.  Two of the men died and the third was on the brink of death.  As stated in the speech of Lord Bingham of Cornhill, the senior law lord on the case,

> It is accepted that the risk of developing a mesothelioma increases in proportion to the quantity of asbestos dust and fibres inhaled: the greater the quantity of dust and fibre inhaled, the greater the risk.  But the condition may be caused by a single fibre, or a few fibres, or many fibres: medical opinion holds none of these possibilities to be more probable than any other, and the condition once caused is not aggravated by further exposure.  So if C is employed successively by A and B and is exposed to asbestos dust and fibres during each employment and develops a mesothelioma, the very strong probability is that this will have been caused by inhalation of asbestos dust containing fibres.  But C could have inhaled a single fibre giving rise to his condition during employment by A, in which case his exposure by B will have had no effect on his condition; or he could have inhaled a single fibre giving rise to his condition during his employment by B, in which case his exposure by A will have had no effect on his condition; or he could have inhaled fibres during his employment by A and B which together gave rise to his condition; but medical

science cannot support the suggestion that any of these possibilities is to be regarded as more probable than any other.  There is no way of identifying, even on a balance of probabilities, the source of the fibre or fibres which initiated the genetic process which culminated in the malignant tumour.  It is on this rock of uncertainty, reflecting the point to which medical science has so far advanced, that the three claims were rejected by the Court of Appeal and by two of the three trial judges.

Fairchild v. Glenhaven Funeral Servs Ltd [2003] 1 A.C. 32, 43.

Lord Bingham framed the issue before the House of Lords in the

following way:

The essential question underlying the appeals may be accurately expressed in this way. If

1. (1) C was employed at different times and for differing periods by both A and B, and

(2) A and B were both subject to a duty to take reasonable care or to take all practicable measures to prevent C inhaling asbestos dust because of the known risk that asbestos dust (if inhaled) might cause a mesothelioma, and

(3) both A and B were in breach of that duty in relation to C during the periods of C's employment by each of them with the result that during both periods C inhaled excessive quantities of asbestos dust, and

(4) C is found to be suffering from a mesothelioma, and

(5) any cause of C's mesothelioma other than the inhalation of asbestos dust at work can be effectively discounted, but

(6) C cannot (because of the current limits of human science) prove, on the balance of probabilities, that his mesothelioma was the result of his inhaling asbestos dust during his employment by A or during his employment by B or during his employment by A and B taken together, is C entitled to recover damages against either A or B or against both A and B?  To this question (not formulated in these terms) the Court of Appeal (Brooke, Latham and Kay LJJ), in a reserved judgment of the court reported at

[2002] 1 WLR 1052, gave a negative answer.  It did so
because, applying the conventional "but for" test of
tortious liability, it could not be held that C had
proved against A that his mesothelioma would probably not
have occurred but for the breach of duty by A, nor
against B that his mesothelioma would probably not have
occurred but for the breach of duty by B, nor against A
and B that his mesothelioma would probably not have
occurred but for the breach of duty by both A and B
together.  So C failed against both A and B.  The crucial
issue on appeal is whether, in the special circumstances
of such a case, principle, authority or policy requires
or justifies a modified approach to proof of causation.

Id. at 40.  The five law lords unanimously agreed that the Court

of Appeal's decision should be reversed.  Lord Cornhill concluded

his speech by answering the question he had posed at the outset:

To the question posed in paragraph 2 of this opinion I
would answer that where conditions (1)-(6) are satisfied
C is entitled to recover against both A and B.  That
conclusion is in my opinion consistent with principle,
and also with authority (properly understood).  Where
those conditions are satisfied, it seems to me just and
in accordance with common sense to treat the conduct of
A and B in exposing C to a risk to which he should not
have been exposed as making a material contribution to
the contracting by C of a condition against which it was
the duty of A and B to protect him.  I consider that this
conclusion is fortified by the wider jurisprudence
reviewed above.  Policy considerations weigh in favour of
such a conclusion.  It is a conclusion which follows even
if either A or B is not before the court.  It was not
suggested in argument that C's entitlement against either
A or B should be for any sum less than the full
compensation to which C is entitled, although A and B
could of course seek contribution against each other or
any other employer liable in respect of the same damage
in the ordinary way.  No argument on apportionment was
addressed to the House.  I would in conclusion emphasise
that my opinion is directed to cases in which each of the
conditions specified in (1)-(6) of paragraph 2 above is
satisfied and to no other case.  It would be unrealistic
to suppose that the principle here affirmed will not over
time be the subject of incremental and analogical

development. Cases seeking to develop the principle must
be decided when and as they arise. For the present, I
think it unwise to decide more than is necessary to
resolve these three appeals which, for all the foregoing
reasons, I concluded should be allowed.

Id. at 68.

The speeches of the other four law lords concurred that basic

justice dictated the result, but they differed as to the

formulation of the underlying legal principle. The opening remarks

of Lord Nicholls of Birkenhead are illustrative.

I have no hesitation in agreeing with all your Lordships
that these appeals should be allowed. Any other outcome
would be deeply offensive to instinctive notions of what
justice requires and fairness demands. The real
difficulty lies is [sic] elucidating in sufficiently
specific terms the principle being applied in reaching
this conclusion.

Id.

Unlike Lord Cornhill, Lord Nicholls regarded the result as

having been reached more on policy grounds than upon a theory that

the negligent conduct of a defendant had been shown to be an actual

physical cause of the injury:

Given the present state of medical science, this outcome
may cast responsibility on a defendant whose exposure of
a claimant to the risk of contracting the disease had in
fact no causative effect. But the unattractiveness of
casting the net of responsibility as widely as this is
far outweighed by the unattractiveness of the alternative
outcome.

Id. at 70. Lord Hoffmann, Lord Hutton and Lord Rodger of

Earlsferry expressed their views as to whether the decision should

be couched in terms of cause or simply good public policy, but each agreed that the result was the only one that justice would countenance.[5]

We have quoted from _Fairchild_ at length to demonstrate why we believe it is indistinguishable from _Gullone_. Plaintiffs have suggested no distinction and have offered nothing but the reluctance of Mr. Mildred to come to any conclusion. We are unable to understand his reluctance in terms of any discernable distinction between the two cases.[6]

A comment in a legal journal published after the _Fairchild_ decision of June 20, 2002 is of some interest:

---

[5] A brief explanation of House of Lords procedure will be helpful. The House of Lords is the English equivalent of the United States Supreme Court. The following information is taken mostly verbatim from the House of Lords Web site, http://www.parliament.uk/documents/upload/HofLBpJudicial.pdf. The judicial work of the House of Lords is performed by Lords of Appeal, appointed by The Queen on the advice of the Prime Minister, usually from the ranks of senior appeal court judges. Although these twelve law lords are full members of the House of Lords, in practice they rarely participate in anything but the judicial business of the House.

The law lords sit in appellate committees of five members to hear appellate arguments. Judgment is given by "putting questions to the House," a procedure which occurs in the chamber. Only the law lords participate, but any member of the House may attend. Each of the five law lords states how he would decide the appeal. These "speeches" are called opinions. "Every word of an opinion is the law lord's own – no one else is involved in the drafting." Formerly, law lords read their full speeches, but as of 1963 they began making only brief oral summaries and providing copies of the full speeches to those in attendance.

When all five law lords have spoken, the senior law lord puts the question to the House: "That the report from the Appellate Committee be agreed to," and an order is entered disposing of the appeal.

[6] Interestingly, it was Mr. Mildred, plaintiffs' expert, who first brought up the _Fairchild_ case. Mr. Underhill, defendants' expert, did not mention it, nor did defendants mention it in their initial brief in support of their motion to dismiss. In a sense, _Fairchild_ seems to pose something of a dilemma for the defendants. If they concede that the case applies, the admission could be offered against them should these plaintiffs — or any others – file against them in the U.K. This may account for the gingerly approach defendants take to _Fairchild_.

What is unusual and potentially far-reaching in this case
is the emphasis their Lordships placed on the supremacy
of achieving a just outcome over what they saw as
dogmatic adherence to conventional legal rules.

The judgment goes back to first principles of tort and
asks for what purpose the rules were first developed--
namely, to ensure that those who are under a duty of care
are protected. The two consequences of each possible
judgement were then examined. On the one side, the lack
of causative evidence, as it is commonly understood,
leading from the injury to a particular tortfeasor, would
mean that it would be possible for a defendant to be
found liable when, if science permitted the matter to be
clarified completely, it would turn out that the
defendant's wrongdoing did not in fact lead to the
claimant's illness. However, this is balanced against
the potential injustice to injured claimants who are not
able to recover for their injuries the risk of which was
materially increased by the defendants.

It was unanimously decided by the Law Lords that the
gravity of the potential injustice to the claimants
justified a lowering of the burden of proof for them.

We conclude that the "but for" rule of causation generally
applicable in the U.K. – and as well in all United States
jurisdictions we are aware of – is very unlikely to be applied to
the <u>Gullone</u> plaintiffs should they file in the U.K.. Consequently,
the rule does not make the U.K. an inadequate forum.

## **Attorney's Fees and the "Loser Pays" Rule**

The other area of concern conceded by Mr. Underhill in his
affidavit, and emphasized by Mr. Mildred in his, is the matter of
financial constraints the plaintiffs might face if required to
litigate in the U.K.  For one thing, contingent fees are not
permitted.  The other problem is the "loser pays" rule, which
requires that the loser pay the costs of the prevailing party,

including attorney's fees. Plaintiffs argue that, for these reasons, "financing this litigation in the U.K. would be prohibitive, and would likely dissuade Plaintiffs from bringing an action there." (Plaintiffs' Mem. at 21.)

But these obstacles are more apparent than real in the circumstances of this case. As for attorney's fees, Mr. Mildred's affidavit describes a device known as "conditional fee agreements" ("CFAs"), which seems to us to provide a likely opportunity for plaintiffs to obtain adequate legal representation on an essentially contingent basis:

> Conditional fee agreements ("CFAs") are permitted in litigation in the English courts. These allow lawyers to represent a party without charge. If the party is successful, the lawyers will recover fees and costs from the opponent in the normal way and may increase their ordinary hourly-based fees payable by the opponent by up to 100% as a reward for taking the risk of acting unpaid (in the event that the case is lost). These arrangements have been lawful subject to onerous formal restrictions since 1995 and were amended in 2000. Despite the length of this period there is little evidence that these arrangements are commonly used in anything but simple road traffic accident claims, employers liability cases and the like.

(Mildred Aff. ¶ 25.) Plaintiffs mischaracterize this paragraph as meaning that the CFA "is limited to less complex proceedings than this one (such as road traffic accidents)" (Plaintiffs' Mem. at 21), apparently intending to convey the impression that CFA's are somehow legally restricted to less complex proceedings, but that is not what Mr. Mildred's affidavit says. He says, rather, that during the ten years the device has been available, "there is

<u>little</u> evidence that these arrangements are <u>commonly</u> <u>used</u> in anything but simple road traffic accident claims, employers liability cases and the like." We do not know what "little evidence" Mr. Mildred is referring to, and we certainly do not know what he means by "commonly used." In fact, most cases are simple, or at least relatively so, and it would follow that almost any procedure would be used more often in simple cases than in more complex ones, simply because there are more simple cases. Very few cases are as complex as this one, and it would not be possible to find evidence that CFAs are "commonly used" in such cases. In short, Mr. Mildred's efforts to minimize the importance of the CFA device are unconvincing. What the device does is to allow an attorney, in a case he or she deems worthy of the risk, to undertake the case in the hope of prevailing and collecting fees from the other side. That is essentially what plaintiffs' counsel in <u>Gullone</u> have done. While a successful outcome might yield greater fees pursuant to their percentage fee agreements than would result from the fee-shifting provided for under a CFA, a fee based on double the amount of the lodestar should still prove attractive to British barristers. This would be especially so when they view the prospects of recovery in the changed landscape of the <u>Fairchild</u> decision. Furthermore, while an attorney can never count on settlement, the likelihood of settlement in cases of this kind – as witness the settlement of our own first generation cases and the

settlement of the British HIV blood cases – can never be ignored. Another consideration for a British barrister would be that much of the discovery pertaining to the liability issues has already been done in the two generations of this MDL and would be available for use in the U.K.

We conclude that plaintiffs would be unlikely to have any difficulty obtaining competent counsel to represent them in a U.K. action. As a practical matter, we see no essential difference between the United States and the U.K. as far as financing this litigation is concerned.

Turning to the "loser pays" rule, Mr. Mildred admits that the British court has discretion as to (a) whether costs are payable by one party to another; (b) the amount of those costs; and (c) when they are to be paid. (Mildred Aff. ¶ 21.) Considering the unfortunate circumstances of the plaintiffs in this case, we have difficulty imagining any court exercising its discretion to order these plaintiffs to pay the attorneys' fees of the defendants. Therefore, we do not regard the "loser pays" rule as a factor that compromises the adequacy of the U.K. forum.

On the basis of the foregoing analysis, we find that the courts of the U.K. would be an adequate forum for the plaintiffs.

Having determined that a alternative forum is both available and adequate, we then turn to a balancing of the private and public interest factors that affect the choice of forum. See Kamel, 108

F.3d at 803. Plaintiff's choice of forum is ordinarily entitled to deference, especially when he has chosen his home forum, which may reasonably be supposed to be convenient for him. But when the plaintiff chooses a foreign forum, "this assumption is much less reasonable. Because the central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference." Piper, 454 U.S. at 256. Plaintiffs' reasons other than their own convenience for choosing the California forum are obvious from their arguments as to why the U.K. forum is inadequate, and they all concern what plaintiffs regard as the less favorable law of the U.K. forum. "However, the deference accorded a plaintiff's choice of forum has never been intended to guarantee that the plaintiff will be able to select the law that will govern the case." Id. at 256-57 n.24.

With these thoughts in mind, we proceed to a discussion of the private and public interest factors that may be relevant to the issue of convenience in this case.

### Private Interests Asserted by the Defendants

The defendants argue that the Northern District of California – and, in fact, any United States forum – is inconvenient for them for several reasons.

### A.  Relative Ease of Access of Sources of Proof

It appears that all of the Gullone plaintiffs used factor concentrates from sources other than, or at least in addition to,

the concentrates manufactured by the defendants. The other concentrates were processed by European and British processors. The defendants argue that the plaintiffs could have contracted their viral infections from these other concentrates, or from other blood products obtained from British and European sources. Some plaintiffs used concentrates of these defendants that were supplied or prescribed by U.K. distributors and physicians. Defendants claim that they wish to conduct discovery of these other suppliers and physicians, and perhaps join them as third-party defendants, but that their right to discovery would be greatly limited if it had to be conducted only in connection with a case pending in the United States. As far as third-party actions are concerned, the possible third-party defendants would not be subject to the jurisdiction of United States courts.

The plaintiffs respond that discovery of possible third parties would be limited even if the case were filed in the U.K. and, as far as third-party actions are concerned, it is doubtful that defendants have any real belief that third-party actions could be successful. It support of the latter argument, plaintiffs point to evidence which satisfies them that the likelihood of infection from U.K. or European sources is extremely small compared to the probability that defendants' products were at fault. There is also evidence that in plaintiffs' opinion establishes that defendants intentionally misrepresented and concealed the risk involved in

their products, causing distributors and prescribing physicians in the U.K. to use defendants' products on the erroneous assumption that they were safe. This, in plaintiffs' view, would render unlikely any successful contribution claim against these distributors and physicians.

Defendants reply that plaintiffs are asking this court, in effect, to grant summary judgment to the possible third-party defendants before there has been an opportunity to conduct the investigation defendants deem necessary.

We agree with plaintiffs that defendants' discovery concerning the claims of plaintiffs would be adequate even if it were restricted to that which is available in this MDL, in the Northern District of California upon remand, and by way of additional discovery that would be permitted in the U.K. The liability discovery is all available in the United States, and it has been conducted in two generations of MDLs. Moreover, that discovery is needed mostly by the plaintiffs, not the defendants. The plaintiffs have provided "patient profiles" concerning their medical histories, although defendants may not be satisfied with their completeness. There are means of obtaining document discovery from third parties in the U.K., and those means are substantially the same whether the case be pending here or in the U.K. Documentary discovery as to the plaintiffs' medical histories, their use of blood products and the likely sources of

infection can be obtained from sources located in the U.K. The main thing that would be missing is discovery depositions, which are not permitted in the U.K. But that is true even if the case were pending in the U.K. On the whole, therefore, we do not believe the U.K. is a substantially more convenient forum for the defendants as far as sources of discovery are concerned.

However, we are not as inclined as plaintiffs are to discount the defendants' argument about their inability to join as third-party defendants British residents who are not subject to the jurisdiction of United States courts. We realize the plaintiffs regard the argument as a pretext, but we are unable to determine the merit of their suspicion without substantially more factual inquiry than we are able to make, or that would be appropriate to make, in considering this motion to dismiss. If the argument were patently frivolous, that would be another matter. But that is not this case and it could be that the defendants sincerely believe that, at some point, they may acquire a legitimate basis for impleading third parties. It is possible, of course, that they could bring contribution actions in the U.K. in the event they should be found liable in the United States cases. But that would be a cumbersome procedure. It is convenience we are considering, and the more convenient course would be to join all parties in one forum.

While access to discovery is not a factor favoring dismissal, we agree with defendants that their ability to join potential third-party defendants is a factor that weighs in favor of the U.K. as the more convenient forum.

### B. Availability of Compulsory Process for the Attendance of Unwilling Witnesses

Defendants contend that there are many British residents they would want to call as witnesses at trial who could not be compelled to attend a trial in a United States court. If these persons were joined as third-party defendants in the U.K., they could, of course, be compelled to attend a trial there. Also, even if they were not impleaded in the case, persons having relevant knowledge, such as plaintiffs' treating physicians, would be subject to compulsory process in the U.K. And defendants are correct that none of these possible British witnesses could be compelled to testify in the United States.

On the other hand, it appears that evidence depositions could be taken in the U.K. and used in trials in the United States. (Plaintiffs point out that video depositions are permitted in the U.K., and this might be almost as effective as the appearance of live witnesses.) Having witnesses appear for trial live in the U.K. would probably be less expensive than taking evidence depositions in the U.K. to be used in the United States, but we do not know how much less.

Plaintiffs respond to defendants' concerns about compulsory process the same way they did to the argument about possible third-party defendants: they discount the likelihood that there are really any important witnesses defendants would want to call who would be unwilling to appear voluntarily in this country. They point out that defendants are vague as to the identities of the U.K. witnesses they would desire to call. This brings us back to defendants' position that, until they have conducted the necessary discovery, they will not know the exact identities of the witnesses.

We are not persuaded that the unavailability of compulsory process for the attendance of unwilling witnesses is a private factor strongly supporting the U.K. as a more convenient forum. Despite defendants' contention that they need discovery, the fact remains that the witnesses they say would be unwilling to appear are at this point hypothetical. Should the witnesses indeed be unwilling to travel, and their testimony prove necessary, evidence depositions might suffice. Without knowing the witness and the circumstances, it is difficult to tell. We would need more information before we could base a dismissal, even in part, on this factor.

### Private Interest Factors Asserted by the Plaintiffs

The plaintiffs point to a number of private interest factors they say would make the U.K. an inconvenient forum for them.

## A.  Location of the Relevant Sources of Proof

Plaintiffs argue that the relevant sources of proof are located primarily in the United States.  They concentrate on the proof of defendants' liability:

> The vast majority of the evidence of Defendants' wrongdoing is located in the U.S.  The shipping records that demonstrate Defendants' dumping of HIV and HCV-contaminated concentrates, the internal memoranda of Defendants' communications with U.K. regulators and treaters that demonstrate concealment of donor recruitment practices and of infections caused by Defendants' product; and the deceptive promotional literature misrepresenting AIDS and hepatitis risks are all located in the U.S.

(Plaintiffs' Mem. at 12.)  The locations of the wrongdoing are not critical to how the wrongdoing can be proved.  The documents referred to by plaintiffs can be produced in evidence in the U.K. just as easily as in the United States.  They have all been identified and authenticated in discovery and are described in the transcripts of the depositions that have been taken.  All of this would be useable in a U.K. trial.

It is true that plaintiffs would be unable to require unwilling liability witnesses to appear personally at a trial in the U.K.  Their evidence depositions would have to be taken in this country.  But it is also true that the subpoena power of any United States district court is limited by Federal Rule of Civil Procedure 45(b)(2) to the geographical limits of the district and, outside the district, to 100 miles from the place of holding court.  Therefore, if plaintiffs should wish to require the personal

attendance of former employees of the defendants who reside beyond those limits, they would be unable to do so and would have to rely on depositions, the same as they would if the case were tried in the U.K.

On balance, we do not think the U.K. forum presents a substantially more serious inconvenience than the Northern District of California as far as compelling the personal attendance of unwilling witnesses is concerned.

### B.  Limitations on Discovery

Plaintiffs argue that if this case were dismissed and they had to refile in the U.K., their discovery would be severely limited in comparison to what would be available in the United States.  They emphasize that the key decision-makers for the defendants were Americans employed in the United States, most of whom no longer work for the defendants and therefore could not be compelled to "appear before a U.K. court." (Plaintiffs' Mem. at 14.)  But, as indicated earlier, these individuals may be beyond the subpoena power of the Northern California district court as well.  We do not know how many of these former employees there are, but plaintiffs say they have deposed twenty of them in the United States.  (Id. )  Plaintiffs express the fear that these depositions might not be admissible in evidence in a U.K. court.  We see no reason they

would not be,[7] especially if defendants agree that the place of taking the depositions would not affect their admissibility.  As a condition of dismissal, we would require such agreement.[8]

While discovery is not as extensive in the U.K. as it is in this country, plaintiffs do not persuade us that this difference makes the U.K. an inconvenient forum for them.  This is especially so in light of the enormous amount of discovery plaintiffs have obtained in the two MDLs, obviating to that extent the need for further discovery.

Plaintiffs' position in regard to discovery is somewhat difficult to understand, because, when they respond to defendants' complaint that necessary discovery from the U.K. can be obtained only if the case is pending there, they cite one of plaintiffs' experts, Professor David McClean, for the proposition that: "[P]arties to proceedings in the United States can, by means of a

---

[7]    The affidavit of Mr. Underhill, defendants' expert, indicates that they would be admissible:  "Written evidence from witnesses not within the jurisdiction (including evidence taken on deposition in prior U.S. proceedings) would be fully admissible, though it remains the case that as regards contested issues the Court is likely to attach most weight to the evidence of "live" witnesses whose testimony has been tested by cross-examination.
    *Evidence from the U.S.*    The U.K. and the U.S. are parties to the Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters 1970. The English Court could accordingly, and in an appropriate case would, invoke the procedures of the Convention for the powers of the U.S. Court to be used to obtain either documentary evidence or witness testimony from the U.S.  An English Court will accept evidence by video-link."  (Underhill Aff. ¶¶ 25-26.)

[8]    Defendants have gone part way in their reply brief:  "As a condition of dismissal of this action, should Plaintiffs refile their claims in the U.K., Defendants will not argue in those U.K. cases that the fact that the discovery was obtained here precludes the plaintiffs from seeking to introduce it in the U.K. cases."  (Defendants' Reply at 17.)  We would require more, namely, that defendants agree to inform the U.K. court that they do not object to the admission of otherwise admissible discovery materials, such as depositions, simply on the basis that they were obtained outside the U.K.

well-drafted letter of request, obtain precisely the same access to evidence as would be available were the proceedings to be conducted in England." (Plaintiffs' Mem. at 14 (citing McClean Aff. ¶ 8).) Plaintiffs' Mem. at 14. It is anomalous for plaintiffs to argue in the face of this statement by Mr. McClean that their access to evidence would be inadequate if they had to file in the U.K. Surely the courts of the U.K. do not allow more discovery in aid of cases pending in foreign countries than they do in their own cases. Finally, the law is clear that even a major reduction in discovery permitted by the proposed alternative forum compared to the chosen forum does not disqualify the alternative forum. See <u>Mercier v. Sheraton Int'l., Inc.</u>, 981 F.2d 1345, 1352-53 (1st Cir. 1992) (citing cases).

### C. <u>Conflicts of Law Problems</u>

Plaintiffs argue that if the case were litigated in the U.K. there would be serious problems as to what substantive law would apply, given that much (although not all) of the activity creating liability occurred in the United States and plaintiffs' injuries occurred in the U.K. We have read this argument with interest but do not believe the U.K. courts would have difficulty determining the appropriate law to apply. Plaintiffs seem to think that conflicts of law issues would be absent were the case to remain in the Northern District of California, but we think similar issues would be presented. In any event, the fact that a proposed

alternative forum might have to deal with a conflicts of law problem does not disqualify it under the doctrine of *forum non conveniens*.

### D. **The Time Required to Conclude the Litigation**

Plaintiffs argue (Plaintiffs' Mem. at 21-22) that proceedings in the U.K. courts, including appeals, will take years to conclude. But the same would be true if the case remains in this MDL and is ultimately remanded to the Northern District of California. It is impossible to know which route would take longer, but it is unrealistic to think that either would be other than long and tortuous. That is in the nature of complex litigation handled by busy courts. Time required for adjudication is not a factor that weighs against the convenience of the U.K. forum.

### E. **The Consequences of Dividing Litigation Among Multiple Fora**

Plaintiffs believe that granting defendants' motion to dismiss would result in judicial inefficiency because, as we understand their concern, everything that has been done in the MDLs would have to be done all over again in the U.K. forum. The argument makes no sense to us; we think it is quite clear that the U.K. forum would make efficient use of what has already been accomplished and would avoid duplication.

It is true, of course, that any court undertaking a trial of any of the MDL constituent cases will be required to try the liability issues as well as the damage issues for the particular

plaintiff or plaintiffs involved in the trial.  This is because class certification has been denied, and each case must be tried on its own, regardless of what decision may have been reached in another case presenting the identical liability issues.[9]  But this situation would not be aggravated by a dismissal of <u>Gullone</u> and a refiling in the U.K.  It would simply mean that the U.K. court would be in the same position as any court in the United States: it would be unable to rely on the result reached in a trial of a different case.

\*     \*     \*     \*

On the basis of the private interest factors, we lean toward granting defendants' motion to dismiss.  We give minimal deference to plaintiffs' choice of forum.  And, largely on the basis of defendants' inability to join potential third-party defendants should the case remain in the Northern District of California, we conclude that the U.K. is a more convenient forum.  Whether it is <u>sufficiently</u> more convenient to justify dismissal is a question we need not resolve, because our ultimate decision will be influenced in the main by the public interest factors we are about to discuss.

## Public Interest Factors

The <u>Kamel</u> court listed the public interest factors mentioned by the Supreme Court in <u>Piper</u>:

---

[9]/  This is aside from the question of possible collateral estoppel should any defendant be found liable in any case.  We express no opinion about that. We are merely addressing plaintiffs' argument that duplication would occur only if the case were refiled in the U.K.

> The public factors include the administrative
> difficulties stemming from court congestion; the local
> interest in having localized disputes decided at home;
> the interest in having the trial of a diversity case in
> a forum that is at home with the law that must govern the
> action; the avoidance of unnecessary problems in
> conflicts of laws or in the application of foreign law;
> and the unfairness of burdening citizens in an unrelated
> forum with jury duty.

108 F.3d at 803 (citing <u>Piper</u>, 454 U.S. at 241 n.6). Not

surprisingly, the parties have different views of how the public

interest affects the analysis of whether the motion to dismiss

should be allowed.

## The Administrative Difficulties Stemming from Court Congestion

The defendants point out that in addition to the eight U.K.

plaintiffs in <u>Gullone</u>, there are an additional sixty U.K.

plaintiffs in the <u>Oakley</u>, <u>Adams</u> and <u>Allen</u> cases pending in this

district and that plaintiffs have submitted patient profile forms

for another 240 U.K. claimants who have not yet filed suit.[10]

Defendants argue that "[t]here is no question that it will be

burdensome for this Court to adjudicate the claims of hundreds of

British plaintiffs, each with separate, complicated individual

trials involving weeks of testimony and argument related to more

than a decade of medical treatment." (Defendants' Mem. at 18.)

This is no exaggeration. In 1993, prior to formation of the

initial MDL, we tried a jury case brought by the administrator of

---

[10]/ Plaintiffs' affiant Mark Mildred states that he is informed by plaintiffs' counsel "that there are more than 250 British plaintiffs in these proceedings." (Mildred Aff. ¶ 30.)

a deceased hemophiliac against these same four defendants, claiming that her decedent had died of HIV infection contracted from the defendants' concentrates. The important thing about that case in terms of the present analysis is that it took seven weeks to try. Just one plaintiff, one HIV infection. In Gullone, we have eight plaintiffs. It is apparently their assumption that all eight claims could be handled in one trial. We think this would be an impossible task for any jury. Each plaintiff has to prove, as to each defendant, that he used the concentrate of that particular defendant and that that defendant's concentrate could reasonably be found to be the cause of his infection. (At that point, in the case we tried under the substantive law of Illinois, the defendant obtained the benefit of the alternative liability theory.) A number of similar cases have been tried in various courts throughout this country, and they have all been complex, multi-week trials, involving lengthy expert testimony. Just the eight Gullone plaintiffs alone, with however many severances might be required in order to have manageable jury trials, would require many months of court time.

The Northern District of California is a congested court, with a high weighted civil caseload of 519 cases per judgeship. By comparison, the weighted civil caseload for the Northern District of Illinois is 451 cases per judgeship, for the Eastern District of Pennsylvania, 449 cases per judgeship, and, for the Southern

District of New York, 448 cases per judgeship.[11]  If the Northern
District of California were to conduct whatever number of jury
trials may be necessary to resolve the claims of the eight U.K.
plaintiffs in Gullone, it would contribute significantly to the
congestion problem the court already has.

We think it appropriate to consider the precedent that might
be set if we were to deny defendants' motion to dismiss the claims
of the eight Gullone plaintiffs, which are likely to be
indistinguishable from the other 250 U.K. plaintiffs who either
have brought or will bring suit in the United States.  We see no
way the decision we reach as to these eight plaintiffs would not
apply as well to all other U.K. plaintiffs.

The plaintiffs give the matter of court congestion scant
attention, commenting only that defendants have failed to prove
there is less congestion in the U.K. courts. (Plaintiffs' Mem. at
25.)  They are silent concerning defendants' prediction that there
will be hundreds of additional U.K. plaintiffs filing complaints in
United States district courts.

Determining whether a foreign forum is less congested than one
of our own is difficult at best.  But even assuming comparable
congestion, the fact that there would not be a jury trial in the
U.K. would make a significant difference in the length of the trial

---

[11]/  Administrative Office of the United States Courts, L. Mecham, Judicial
Business of the United States Courts: 2004 Report of the Director 396-99, Table
X-1A.

and therefore in the impact it would have on the court's calendar. Jury selection, arguments during the trial about what evidence should and should not be seen and heard by the jury (as opposed to the relatively relaxed reception of evidence in a bench trial), delays caused by absent or tardy jurors – often unavoidable – arguments about jury instructions, final arguments and instructions to the jury and jury deliberations on the verdict all take time in American courts that is not required in non-jury systems. Every trial judge knows that, generally speaking, a bench trial can be conducted in substantially less time than the same trial before a jury. We think the same difference exists as between non-jury and jury systems: a congested non-jury system can accommodate an additional caseload more easily than a congested jury system. We believe, for instance, that an experienced English judge would be able to try the claims of more Gullone plaintiffs in a single trial than a lay American jury would be able to comprehend and decide in a single trial.[12]

For these reasons, we believe that the administrative difficulties stemming from court congestion strongly favor the U.K. forum.

---

[12]/ The length and complexity of a trial will depend to some extent on the medical histories of the plaintiffs, which run from relatively simple to extremely complicated. The simple one would be a plaintiff who had used the concentrate only of only one defendant. This would be unusual. The typical plaintiff has used a variety of concentrates, and proof implicating particular fractionators is often circumstantial and time-consuming.

## The Local Interest in Having
## <u>Localized Disputes Decided at Home</u>

The parties differ as to whether the Northern District of California or the U.K. has the greater interest in the controversy. Plaintiffs argue that the U.K. and its courts have no interest in determining the validity of plaintiffs' claims, whereas the citizens of the Northern District of California and the Northern District of Illinois[13] have a strong interest. Plaintiffs argue that "a state has a strong interest in regulating companies it has chartered and who have chosen to locate themselves within its borders." (Plaintiffs' Mem. at 24). The defendant Alpha is a California corporation, but none of the other three defendants is. It is not clear which of the defendants is alleged to have committed any tortious conduct in the state of California that resulted in injury to the plaintiffs, or how great the interest of California citizens is in redressing any such injuries. The holding of the Court in <u>Dowling v. Richardson-Merrell, Inc.</u>, 727 F.2d 608 (6th Cir. 1984), affirming a dismissal for *forum non conveniens* in a pharmaceutical product liability case, is of interest:

> The interest of the United Kingdom in this litigation is great. The drug was manufactured under a British license by British companies and was marketed and prescribed in

---

[13]/ Plaintiffs place great emphasis on the fact that two of the defendants have offices in the Northern District of Illinois. However, <u>Gullone</u> was filed, and would be tried, in the Northern District of California, not the Northern District of Illinois.

the United Kingdom.  The alleged injuries took place in England and Scotland and the plaintiffs are citizens and residents of those countries.  When a regulated industry, such as pharmaceuticals in this case and passenger aircraft operations in *Piper Aircraft,* is involved, the country where the injury occurs has a particularly strong interest in product liability litigation.  <u>This interest is highlighted in the present cases by the plaintiffs' charge that the defendant concealed adverse test results from the national health authorities in Great Britain</u>. Though no single factor should be determinative in ruling on a *forum non conveniens* motion, the nature of the product and its status as regulated or not must be considered.

*Id.* at 616 (emphasis added).  The observations of the Seventh Circuit in <u>Kamel</u>, a suit brought by a Saudi Arabian citizen against an Indiana corporation in the district court for the Southern District of Indiana, are also instructive:

Here, we do not even have an American plaintiff. Instead, we have a foreign plaintiff who was injured in a foreign land filing suit against an American defendant with extensive foreign dealings.  The district court thus made a permissible inference that Indiana residents have a mere passing interest in this case.

108 F.3d at 804-05.

On the other hand, we simply do not believe plaintiffs' assertion that the citizens and government of Great Britain would take no interest in the allegation that hundreds of their citizens have been infected with the HIV virus as a result of negligence and fraud.  The defendants have put the matter well:

In fact, the U.K. government has shown considerable interest in the issues of this case: The U.K.'s Legal Services Commission, which bases its funding decision on the U.K.'s public interest in litigation, funded claims brought by U.K. hemophiliacs against the U.K. government for HIV and HCV infection.  Mildred Aff. ¶ 24.  The U.K.

> government has set up funds to compensate hemophiliacs
> for HIV and hepatitis infections, and has provided the
> equivalent of millions of dollars to those hemophiliacs,
> including the plaintiffs in this action.

(Defendants' Reply at 19-20.)

The interest of the U.K. in the adjudication of this controversy far outweighs the interest of California residents. This is a factor that points strongly to the U.K. as the more convenient forum.

**Familiarity With the Governing Law,**
**<u>Avoidance of Unnecessary Conflicts of Law Problems</u>**

These two public interest factors can be discussed in tandem. There is no reason to believe the U.K. forum would have any great difficulty in determining the applicable law or in resolving any conflicts of law problems. Neither of these factors suggests that the U.K. would not be a convenient forum.

**The Unfairness of Burdening Citizens**
**<u>in an Unrelated Forum with Jury Duty</u>**

This is the last of the public interest factors listed in the <u>Kamel</u> case, and what we have already said about the difficulty of jury service in cases of this complexity and length is indicative of our view as to how fair it would be to call upon citizens of the Northern District of California, an unrelated forum, to devote their time to the trial of these <u>Gullone</u> claims. The alternative is not even to shift the burden to residents of the U.K. who would have to serve as jurors there. There would be no jurors there. The case would be tried by a judge, a professional trier of fact

whose full-time occupation it is to preside over trials of all kinds, including lengthy, complex ones. This seems to us more fair than to impose the burden on persons whose only connection to the judicial process is that they happen to be residents of the Northern District of California.

### Conclusion

Because of the undue administrative burden the trial of this case would impose upon the Northern District of California and its citizens who would be required to serve as jurors, and because the United Kingdom is an available and adequate alternative forum for the adjudication of plaintiffs' claims, and because the citizens of the United Kingdom have a greater interest in this controversy than do the citizens of the Northern District of California, we find that the United Kingdom is a greatly more convenient forum than the Northern District of California for the adjudication of plaintiffs' claims. Accordingly, subject to the conditions noted below, we will enter an order granting the defendants' motion to dismiss this case on the ground of *forum non conveniens*.

In order to ensure the adequacy of the U.K. forum for the prosecution of plaintiffs' claims, and to ensure that any judgment obtained by plaintiffs in that forum will be enforceable, the dismissal will be subject to the following conditions, all of which defendants have indicated are, in substance, agreeable to them:

    A. Defendants agree to accept service in actions brought by plaintiffs in a court of the U.K., so long as

plaintiffs file such actions within 90 days of this
court's order dismissing this action or, in the event of
an appeal, within 90 days of any order by the Seventh
Circuit Court of Appeals or the United States Supreme
Court which has the effect of making the dismissal order
final;[14]

B. Defendants agree to satisfy a final judgment rendered
by a court of the U.K.;[15]

C.   Defendants agree to exclude from calculation of
statutes of limitations time periods the period of time
plaintiffs' claims have been pending in this action and,
in addition, any period of time during appeal from the
dismissal order prior to an order of the Seventh Circuit
Court of Appeals or the United States Supreme Court which
has the effect of making the dismissal order final;[16] and

D. Defendants agree to advise the U.K. court that they
have no objection to the admissibility of depositions
taken in the United States or other materials obtained in
discovery in the United States simply on the basis that
the depositions or other materials were obtained outside
the U.K.[17]

Upon the filing of defendants' statement that they agree to each of

the conditions A through D, the court will enter an order

dismissing this action on the ground of *forum non conveniens*.  The

statement should be filed no later than 10 days from the date of

this opinion.

---

[14]/ We have added the provision about an appeal, which was absent from
defendants' stipulation.  (Defendants' Mem. at 4.)

[15]/ (Defendants' Mem. at 14.)

[16]/ (Defendants' Reply at 7.)  We have added the language about the time
involved in an appeal.

[17]/ (Defendants' Reply at 17.)  Defendants would, of course, retain the
right to object to the admissibility of the materials on any ground afforded by
the rules of evidence.

DATED:     January 5, 2006


ENTER:   _____
         John F. Grady, United States District Judge