**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re Factor VIII or IX | ) | |
| Concentrate Blood Products | ) | |
| Litigation | ) | 93 C 7452 |
| | ) | MDL 986 |
| _____ | ) | |
| | ) | |
| ABAD, et al. | ) | |
| | ) | 04 C 1446 |
|    v. | ) | |
| | ) | |
| BAYER CORP., et al. | ) | |

**MEMORANDUM OPINION**
*(Ruling on Argentina Forum Non Conveniens Motion)*

The plaintiffs in this multidistrict litigation are persons suffering from hemophilia who claim to have become infected with HIV or hepatitis C as a result of using factor concentrates (blood-clotting products derived from the plasma of blood donors) manufactured by the four defendant pharmaceutical companies. The litigation is long-standing and now in its "second generation," consisting largely of cases brought by residents of foreign countries. The history is recounted in In re Factor VIII or IX Concentrate Blood Prods. Liab. Litig., 408 F. Supp. 2d 569, 570-73 (N.D. Ill. 2006)(ruling on United Kingdom *forum non conveniens* motion).

All of the complaints in the current MDL are substantially similar. They allege that the defendants negligently allowed their factor concentrates to be contaminated by HIV and hepatitis C from infected blood donors, causing those viruses to be transmitted to the plaintiffs when they infused the concentrates. The alleged negligence consisted of using plasma from high-risk blood donors, such as homosexual men and intravenous drug users, and then failing to take available precautions, such as heat treatment, to kill any dangerous viruses during the manufacturing process. The second claim, added by these "second generation" cases, is that the defendants, after learning that their untreated concentrates could transmit the viral infections, fraudulently "dumped" untreated concentrate on foreign markets while at the same time withdrawing the untreated product from the United States market. The defendants deny all of these claims.

Almost all of the straight negligence claims brought by United States plaintiffs were settled over ten years ago, but the more recent cases brought by the foreign residents are pending before this court on defense motions to dismiss for *forum non conveniens.* We have dismissed the claims brought by the residents of the United Kingdom on that basis, and that decision was affirmed. <u>In re Factor VIII or IX Concentrate Blood Prods. Litig.</u>, 484 F.3d 951 (7th Cir. 2007).

The issue presently before this court is whether to dismiss for *forum non conveniens* the cases brought by residents of Argentina who claim to have become infected by using one or more of the defendants' concentrates in Argentina. Defendants assert that Argentina is a more convenient forum for the litigation of those claims.

The United Kingdom claims were referred to as the <u>Gullone</u> case because that was the name of the first-named plaintiff in the low-numbered case with United Kingdom plaintiffs. For convenience, we will refer to the Argentine claims as the <u>Abad</u> case, since that is the name of the first-named plaintiff in the low-numbered Argentine case.

A total of 880 Argentine plaintiffs have filed suit. Their claims are set forth in a number of separate complaints, each joining multiple plaintiffs. Most of the Argentine plaintiffs (855 of the 880) filed suit in Florida state court, and the defendants removed the cases to the United States District Court for the Southern District of Florida on the basis of diversity jurisdiction. Of the Florida plaintiffs, 600 allege that they were infected in Argentina. Another 17 plaintiffs infected in Argentina are included in complaints transferred here from the Northern District of California, and 2 more are plaintiffs in suits filed in this district (which we are treating as part of

the MDL), making a total of 619 plaintiffs the defendants are moving to dismiss.

## The Law of *Forum Non Conveniens*

The steps involved in a *forum non conveniens* analysis are well-settled. The first step is a two-part inquiry as to whether the proposed alternative forum - here, Argentina – is <u>available</u> and <u>adequate</u> for the litigation of plaintiffs' claims. <u>Kamel v. Hill-Rom Co.</u>, 108 F.3d 799, 802-03 ("An alternative forum is available if all parties are amenable to process and are within the forum's jurisdiction. An alternative forum is adequate when the parties will not be deprived of all remedies or treated unfairly."). If the alternative forum is both available and adequate, "the district court must then balance the private and public interest factors that emerge in a given case." <u>Id.</u> (citations omitted).

## Availability and Adequacy

Both questions are in dispute. Defendants stipulate that if we grant their motion they will subject themselves to the process of the Argentine courts so as to be within the jurisdiction of those courts. Therefore, they say, the Argentine forum is "available." Plaintiffs respond that the Argentine courts cannot assert jurisdiction in these cases because the plaintiffs have

elected to sue in the United States, and, moreover, no act or event that could establish jurisdiction occurred in Argentina.

The parties' arguments are based upon their differing interpretations of what they agree is the governing provision of the Argentinian Code of Civil and Commercial Procedure. It reads in relevant part, in defendants' translation from Spanish, as follows:

> Except for cases of express or implied expansion of jurisdiction, where applicable, and notwithstanding any special rules contained in this Code and other laws, ... (4) In personal actions based on intentional or unintentional torts, the competent court shall be the court sitting where the event took place or the place of residence of defendant, at the election of the plaintiff.

(Decl. of Professor Atilio Anibal Alterini, Ex. F to Defs.' Mem. in Supp. of Mot. to Dismiss, at 4.) The plaintiffs' translation of the provision is somewhat different. Instead of "where the event took place or the place of residence of defendant," their translation, provided by their expert, Dr. Edgardo Rotman, is "place of the act or where the defendant is domiciled." (Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss at 4.) The difference between "residence" and "domiciled" is not important, but the difference between "event" and "act" is thought by plaintiffs to be critical to their position that jurisdiction can lie only where the defendants acted, meaning where the defendants

manufactured the injurious concentrates. That was in the United States, not Argentina. The defendants, on the other hand, believe that "event" is the proper translation of the Code provision and that "event" is a word that applies to the plaintiffs' becoming infected, which occurred in Argentina.

The Spanish word used in the Code provision is "hecho," which defendants' expert Alterini translates as "event." (Alterini Dep. at 74.) Plaintiffs' expert Dr. Rotman says that "hecho" is a word "which has many meanings," but "[i]n the context of the present case the correct meaning is 'act' or 'action'." (Aff. of Edgardo Rotman, Ex. C to Pls.' Mem. in Opp'n, at 7 ¶ 14).

We will now discuss the parties' experts and the reasons they give for their opinions on the issues of availability and adequacy.

### The Defendants' Experts

### Atilio Anibal Alterini

Dr. Atilio Anibal Alterini,[1] presently the Dean of the Law School of the University of Buenos Aires, has served as a judge and practicing lawyer in Argentina for many years. The list of his teaching positions, judicial service and legal publications takes up most of the first three pages of his declaration.

---

[1] In Argentina, attorneys are called "doctor."

(Alterini Decl. at 1-3.)   His law practice has included representation of both plaintiffs and defendants in products liability cases in Argentina.   Referring to the Code provision in question, he states:   "In my opinion, the 'place where the event took place' is where the infection occurred because before that there was no damage, and I assume that the infection occurred in Argentina."  (Id. at 4.)

When the plaintiffs took Dr. Alterini's deposition, he explained again that this "is a case involving damage sustained by the victims.   And this damage is caused when the infection takes place."   The risk of infection is introduced at the time and place of manufacture, "[b]ut that has nothing to do with liability.   There is no liability without damage."  (Alterini Dep. at 86.)   The plaintiff does not have a right to bring the lawsuit until after he suffers the damage.  (Id. at 94.)   As far as a claim regarding impending or threatened damage, "[t]here is no such thing."  (Id. at 95.)

**Alberto Jesus Bueres**

The defendants' other expert witness is Dr. Alberto Jesus Bueres.   He is head of the chair of Civil Law at the Law School of the University of Buenos Aires.   He has also practiced law and served as a judge in Argentina for a number of years.   A list of his academic and professional credentials, publications and

awards runs for more than five pages (Decl. of Alberto Jesus Bueres, Ex. G to Defs.' Mem. in Supp. of Mot. to Dismiss, at 1-6) and is impressive.[2]  In his declaration, Dr. Bueres states that in the event of a *forum non conveniens* dismissal in the United States, the "Argentine court is obliged to take jurisdiction as, precisely, it is in Argentina that the victim suffered the injury.  The place where the damage occurred is the place where the plaintiff became infected with HIV and/or hepatitis C." (Id. at 7 ¶ 2.)  Thus, Dr. Bueres, like Dr. Alterini, opines that jurisdiction exists at the place where the injury occurred and that an FNC dismissal in the United States would not bar a refiling in Argentina.  In his deposition taken by the plaintiffs, he stated that he had no doubt that the "harmful event" took place in Argentina because it was the place where the infection occurred.  He "absolutely disagree[s]" with plaintiffs' experts' opinion that the place of the event would be the place where the products were manufactured.  "When the products were manufactured, there was no intentional tort or unintentional tort." (Bueres Dep. at 80-81.)  If the Argentine court did not

---

[2]    The credentials of expert witnesses in the United States are often difficult for a judge to evaluate and often carry far less weight than the actual experience of the witness with the particular subject matter of the case.  The credentials of the Argentine witnesses in this case present at least the usual difficulty of evaluation and, in addition, are tempered to a degree by their admitted lack of experience in cases presenting issues of the kind involved in defendants' motion to dismiss.

accept jurisdiction after an FNC dismissal by a United States court, this would, in his opinion, violate the Argentine constitution. (<u>Id.</u> at 81.)

He knows of no case like this one. He is giving his opinion as to how the Argentine courts should rule. "This is an opinion of my own that I consider reasonable, but I can't quote any specific analogous case." (<u>Id.</u> at 82.)

In his opinion, if a United States court declines to exercise jurisdiction and dismisses the case without rendering judgment on the merits, and the plaintiff comes to Argentina, the "Argentine judge would have to accept jurisdiction." (<u>Id.</u> at 139-40.)

## The Plaintiffs' Experts

### Edgardo Rotman

Dr. Edgardo Rotman is a United States citizen who is employed full-time at the University of Miami School of Law as a Senior Lecturer in International and Comparative Law. He is also the foreign and international law librarian. He received his law degree from the National University of Buenos Aires School of Law and also a Ph.D. in law and social sciences. He has taught comparative law at Boston University School of Law and at the National University in Buenos Aires. He has practiced law in Argentina and in Massachusetts. His practice in Argentina

included personal injury claims. He has given expert legal opinions on the laws of Argentina, Venezuela, Columbia, Mexico, Italy, Guatemala, Germany, Austria and Belgium. He is fluent in a number of languages, including English and Spanish. (Rotman Aff. at 1-2.)

Dr. Rotman begins the opinion portion of his affidavit with the following statement:

> In a survey conducted by Professor David Robertson of 180 international cases dismissed from United States courts for *forum non conveniens,* not a single one proceeded to a courtroom victory in the foreign forum.

(Id. at 3-4.)

Dr. Rotman believes that the Abad cases could not have been filed initially in Argentina, but if, hypothetically, they were filed in Argentina, there is no way the claims of more than one plaintiff could be joined in a single action. Each plaintiff would have to pursue his or her case individually. (Id. at 4-5.)

Dr. Rotman states that Argentine courts have no jurisdiction over these cases because, under Article Five, Section 4 of the Argentine Federal Code of Civil Procedure, jurisdiction is only "at the place where the illegal act occurred or at the place where the defendant is domiciled." (Id. at 6.) In a products liability case, the country of the domicile of the defendant is the correct forum. This normally coincides with the place where

the wrongful behavior occurred, "that is, the place where the product was manufactured or designed." (<u>Id.</u>) In support of these conclusions, Dr. Rotman refers to several libel cases where the Argentine courts held that the place of publication, rather than the place where the plaintiff felt the effects of the publication, was the place where the wrongful act took place. (<u>Id.</u> at 7-9.)

All documents supporting the claim "must be attached to or duly identified in the complaint, which must include a complete list of the evidence to be produced during the lawsuit, making the whole complaint process a one-shot game." The documents must also be in Spanish, and "[t]hat alone precludes the Plaintiffs from ever litigating these cases in Argentina. In any event, the documentary evidence that would be attached to Plaintiffs' complaints would be ignored by the Argentine courts for the reasons stated in section 20 of this affidavit." (<u>Id.</u> at 5.) In section 20, Dr. Rotman explains that the evidence obtained in pretrial discovery in this country would in inadmissible in an Argentine court. Evidence "produced outside the presence of the judge is invalid. This would mean the loss of the evidence gathered in the United States if the case is transferred to Argentina." (<u>Id.</u> at 11.)

In sum, Dr. Rotman's affidavit states that the <u>Abad</u> cases could not have been filed in Argentina, nor could they be refiled there now, because of a lack of jurisdiction. Moreover, presuming *arguendo* that the cases could be refiled in Argentina, none of the evidence obtained in this lengthy MDL could be used there, since it was not obtained through the Argentine courts. Nor would there be any way of duplicating that evidence in substantial degree, since pretrial discovery does not exist in Argentina, see <u>id.</u> at 5.

The defendants took Dr. Rotman's deposition. He stated that he began practicing law in Argentina in 1960 or 1961 and left Argentina in the early 1980s. (Rotman Dep. at 41.) He handled all kinds of cases, including products liability cases. Actually, they were automobile accident cases, not products liability cases. (<u>Id.</u> at 42.) He did not specialize in any branch of the law. (<u>Id.</u> at 42-43.) Much of his work was collection work. He does not recall handling any cases involving foreign defendants or in which the court applied foreign law. (<u>Id.</u> at 44.) The subject he taught at the University of Buenos Aires was criminal law. (<u>Id.</u> at 47.)

The Robertson study Dr. Rotman refers to in his affidavit, which found not a single dismissed case had later proceeded to a courtroom victory, was based on "postal questioning to a series

of attorneys that had their cases dismissed." The letter was sent to 180 lawyers. (<u>Id.</u> at 48.) He does not know how many of them responded. The article about the survey was in the Cornell Law Review. Shown the article by defense counsel, the witness noted that 85 lawyers responded. (<u>Id.</u> at 49-50.) Of the 85, 12 of them stated that they had no information about the cases, so information was provided on 73 of the 180 cases. (<u>Id.</u> at 50.) Dr. Rotman testified that he did not study the details of the survey, but just paid attention to the conclusion. (<u>Id.</u> at 51.) Looking at the article, it says that "none of the <u>reported</u> cases proceeded to a courtroom victory in the foreign forum." (<u>Id.</u> at 55 (emphasis added).) And 95 of the cases were not reported. So Dr. Rotman does not know whether any of the unreported cases may have proceeded to a courtroom victory. (<u>Id.</u> at 55-56.) (Nor, obviously, does he know whether any of them were settled on terms satisfactory to the plaintiffs.)

Dr. Rotman stated that the evidence the plaintiffs have obtained in the United States could have been obtained in Argentina, in a different way. But if the cases were refiled in Argentina, that evidence would be lost "because it was not produced according to the rules of production of evidence in Argentina." The plaintiffs could not ask for the evidence again under the Argentine rules. (<u>Id.</u> at 64.)

He is not saying that just because defendants have given the documents to the plaintiffs before, they can't give them to them again. "If it's within the rules of production of evidence in Argentina, they can obtain that evidence." (<u>Id.</u> at 67.)

If the cases were to be refiled in Argentina – which they could not be — and the four defendants manufactured the factor concentrates in four different United States domiciles, he "guesses" the court would apply four different laws. (<u>Id.</u> at 69-70.)

Article Five, Section 4 of the Code provides that the court where the "tortious action" took place has jurisdiction. (<u>Id.</u> at 70-71.) The Article does not directly say that the court where the plaintiff was injured does not have jurisdiction, but, because jurisdiction is at the place where the tortious act occurred, that "obviously eliminates that possibility." (<u>Id.</u> at 71.) His authority for that proposition is the libel cases he refers to in his affidavit. (He is not sure, but he assumes they were all libel cases.) (<u>Id.</u> at 72.) He is not aware of any other cases that have addressed this issue, and he researched the question thoroughly. (<u>Id.</u> at 72-73.) The cases he cited are not specific to libel, but are general conclusions about the application of Article 4 [sic] that apply to all cases. (<u>Id.</u> at 74.)

Dr. Rotman agrees that if something libelous is published about someone, that person is injured when that publication is made. (Id.)

Dr. Rotman agreed that a person could not file a lawsuit for an HIV infection before he was infected with HIV. (Id. at 75.) A statute of limitations does not begin to run before the person is injured. There is no cause of action before the person is injured. (Id. at 82.)

He does not recall any cases where an Argentine court refused to exercise jurisdiction after there had been a *forum non conveniens* dismissal in another jurisdiction. (Id. at 107.)

### Alejandro Miguel Garro

Another of the plaintiffs' experts is Dr. Alejandro Miguel Garro, an adjunct professor at Columbia University Law School who teaches comparative law and international commercial law. His teaching covers the legal system of Argentina. He has been at Columbia since 1981. He has been licensed to practice law in Buenos Aires since 1975 and in New York since 1982. (Decl. of Professor Alejandro Miguel Garro, Ex. D to Pls.' Mem. in Opp'n, at 1.) He has appeared as an expert witness on Latin American legal systems, including the legal system of Argentina, before various courts, including courts in the United States. He is the author and co-author of books and articles on comparative law and

Latin American law, listed in the curriculum vitae attached to the declaration.[3]

Dr. Garro states in his declaration that judicial decisions are given far less weight in Argentina than in the United States. There is no formal requirement for courts to follow precedent. (Id. at 5.)

On the question of whether Argentine courts are "available" to adjudicate plaintiffs' claims, Dr. Garro agrees with defendants' Dr. Alterini that the relevant rule is Article 5(4) of the Code, which provides that the competent court is the one sitting where the wrongful act (hecho) took place. (Id. at 6.) However, Dr. Garro believes that Dr. Alterini misleadingly fails to mention the rest of the relevant provision, which is that jurisdiction also exists at the "place of residence (domicilio) of defendant, **at the election of the plaintiff**." (Id. at 6-7.) Dr. Garro goes on to say that because plaintiffs exercised their election in favor of the defendants' domiciles in the United States, Argentine courts now lack jurisdiction. Although "the courts of the place where the infection occurred or the harm was done would have jurisdiction, such jurisdiction cannot be exercised" because plaintiffs have elected to sue in defendants' domiciles. (Id. at 7.) Therefore, "the courts of Argentina are

---

[3] No curriculum vitae is attached to our copy of the declaration.

not 'available' to entertain jurisdiction over this case." (Id. at 7 (emphasis added).)

On the question of adequacy, Dr. Garro states in his declaration that he has never heard of a case where an Argentine court has accepted evidence produced before a court of a foreign country. In his opinion, if these cases were refiled in Argentina, all of the United States discovery would have "to be produced again," regardless of whether the defendants agreed not to object to it. (Id. at 11.)

In his deposition, Dr. Garro stated that he practiced law in the province of Buenos Aires from 1975-1977. (Garro Dep. at 35.) In that two-year period, he represented parties in products liability cases a dozen times or so. (Id. at 36.)

He has never taught a course on torts or products liability law. (Id. at 39.)

In one of the articles he wrote, he pointed out that in most Latin American legal systems there are two kinds of contacts that can be used to establish jurisdiction. The second is "the place where the wrongful act was committed or the injury was suffered," and this is true in Argentina. His article refers to the "golden principle" that a tort action can always be heard by the court of

the place where the wrongful act or injury occurred. (Id. at 48-50.)[4]

Dr. Garro is not aware of any personal injury case where an Argentine plaintiff has sued in the in province where he suffered his injuries and the court refused to take jurisdiction. He believes it would be improper for a court to dismiss such a case for lack of jurisdiction, because Article 5(4) of the Code of Civil Procedure gives the plaintiff "that right to sue at the place where the wrongful act took place." (Id. at 55.)

Article 5(4) does not specifically address the situation of cases dismissed by foreign courts. Dr. Garro knows of no case where an Argentine court has accepted jurisdiction over such a dismissed case. (Id. at 58.) On the other hand, he is not aware of any case that has been dismissed by a United States court without prejudice and an Argentine court has refused to take jurisdiction. (Id. at 60.) Neither is he aware of any case that has been successfully refiled in any Latin American court. (Id. at 61.) He knows there are many cases that United States courts have dismissed on *forum non conveniens* grounds and sent to Argentina. He does not know whether those cases were refiled,

_____

[4] At one point in his declaration, the witness referred to Article 5(5). That was a mistake; it should have been Article 5(4). (Garro Dep. at 55-56.)

and he "would like to know of course." He suspects that many of them settled without refiling. (<u>Id.</u> at 62-63.)

Most of his twelve "product liability" cases in Argentina were automobile accidents. (<u>Id.</u> at 72-73.) He did not see any of them through to the end in his two years of practice. (<u>Id.</u> at 75.)

It is possible to consolidate similar cases in Argentina. (<u>Id.</u> at 80-81.)

The parties do not exchange evidence with each other in Argentina the way they do in the United States discovery process. If one party identifies evidence that the court thinks is relevant, the court will order the other party to produce it. (<u>Id.</u> at 86.)

Documentary evidence is required to be attached to the complaint. This means all documents that are relevant to the case, significant to the outcome. (<u>Id.</u> at 88-89.)

In Dr. Garro's opinion, an Argentine court would not accept evidence taken before a United States court, but he has no case that holds this. He makes this statement because "that's the reasonable cause [sic] of action that a court in Argentina will take." (<u>Id.</u> at 94.) He is not familiar with any case in which an Argentine court has been asked to consider deposition testimony from a foreign proceeding. (<u>Id.</u> at 95.) The witness

went on to say that conceivably the written testimony could be introduced as documentary evidence and the court will take it for what it is worth. But it is inconceivable that an Argentine court would take the deposition in the same way as a court in the United States would take it as evidence. (Id. at 95-96.)

The witness has never acted as a judge in Argentina. (Id. at 96.)

### **Alberto F. Garay**

The third witness presented by the plaintiffs is Dr. Alberto F. Garay, a trial lawyer who has practiced in Argentina for 26 years. He has law degrees from the University of Buenos Aires School of Law and Columbia University School of Law. He has also taught various courses at the University of Buenos Aires School of Law, first as a teaching assistant and, since 1995, as a professor. (Decl. of Alberto F. Garay, Ex. E to Pls.' Mem. in Opp'n, at 2, 10-11.)

Dr. Garay states in his declaration that there is a procedure in Argentina for joining plaintiffs with similar injuries in the same case. (Id. at 3.)

There is no pretrial discovery in Argentina as it is known in the United States. The plaintiff must attach to the complaint all documents in support of his case and must also name the persons having other relevant documents and ask the court to

order those third persons to submit those documents. The same is true for the defendant. (<u>Id.</u> at 5-6.)

After thorough research, Dr. Garay has found no Argentine case that, in order to reach a decision, has referred to proofs collected in the United States through pretrial discovery. The only way such foreign documents could be submitted in Argentina would be by way of the Hague Convention. An Argentine court must approve the parties' request and deliver a letter of request to the authority appointed by the United States Secretary of State. (<u>Id.</u> at 7.)

There is a limitation of eight witnesses per party. More are permitted only if the judge decides it is "strictly necessary." (<u>Id.</u>)

Dr. Garay's declaration does not address the question of whether a case dismissed by a United States court for *forum non conveniens* could be refiled in Argentina.

In his deposition taken by the defendants, Dr. Garay indicated that his area of academic expertise is procedural law, the right of appeal, and constitutional law. (Garay Dep. at 23.) He does not recall ever having handled a products liability case. (<u>Id.</u> at 40.) He has not taught courses on products liability or torts. (<u>Id.</u> at 42.)

He has no opinion as to whether the plaintiffs could have filed their suits in Argentina. He did not consider that. (<u>Id.</u> at 48.) He is "not very sure" that they could have filed in Argentina. He would have to know the facts of the individual cases. (<u>Id.</u> at 49.) He is unable to answer the question of whether a plaintiff infected with HIV in Argentina by a medicine he took in Argentina could file suit in Argentina. He does not have enough facts. (<u>Id.</u> at 50.) He has no opinion as to whether the court would, on its own, dismiss such a case even if the defendant did not contest jurisdiction. (<u>Id.</u> at 51.)

He has not found a case in which an Argentine court has refused to consider proofs collected in the United States in pretrial discovery. (<u>Id.</u> at 60.)

\*　　\*　　\*　　\*

## <u>Analysis of the Evidence on Availability</u>

At the very threshold of our analysis there must be a determination as to whether Argentina is available to plaintiffs as an alternative forum. Only if Argentina is available need we consider whether it provides an adequate remedy and if so, whether a balancing of the private and public interest factors weighs for or against dismissal.

We have set forth the testimony of the expert witnesses at some length because that testimony must be the basis for our decision. As is made clear from the foregoing summaries of the expert testimony, there is no Argentine case law in point on the two availability questions raised by the plaintiffs — whether suit may be brought at the place of injury and whether a case dismissed by a foreign court on the ground of *forum non conveniens* can be refiled in Argentina. All of the experts who opined on those issues did so on the basis of what they <u>think</u> the Argentine courts would do if the questions were presented. Obviously, there can be no certainty. But this is the nature of expert testimony, whether it be about law or any other subject. It is the difference between "fact" and "opinion" testimony. An admission by the expert witness that his or her opinion is just that and could be wrong will rarely impair the credibility of the witness.

In weighing the credibility of an expert witness, just as any other witness, a court is entitled to consider the inherent plausibility of the testimony. If the testimony runs counter to the judge's common sense, or the judge's own experience, to the extent he or she has any experience that is relevant, this is a factor that can weight against acceptance of the opinion. For example, in <u>PT United Can Co. v. Crown Cork & Seal Co.</u>, 138 F.3d

65 (2d Cir. 1998), a *forum non conveniens* case, the Court
commented on the opinion of the defendants' Indonesian law expert
that Indonesian courts would have personal jurisdiction over the
foreign defendants because <u>plaintiff</u> was an Indonesian
corporation:

> The Indonesian lawyer's affidavit suggests a seemingly
> absurd Indonesian extraterritoriality rule: global
> jurisdiction of Indonesian courts for any case
> involving an Indonesian plaintiff. One assumes that
> jurisdiction over defendants exists on consent,
> contacts, or some similar basis.

138 F.3d at 75 n.6.

We will begin with a discussion of whether the fact that the
plaintiffs were infected in Argentina would give the courts of
Argentina jurisdiction on the basis that the act, or event (the
hecho), occurred there. Defendants' experts Alterini and Bueres
both said it would. Plaintiffs' expert Garro agreed that it
would. Plaintiffs' expert Garay has no opinion one way or the
other. The only expert who says jurisdiction would not lie in
Argentina is plaintiffs' expert Rotman, who says that only the
courts at the place where the infectious concentrate was
manufactured would have jurisdiction. He interprets "hecho," the
harmful act, as the act of manufacturing. His sole authority for
this conclusion is a group of Argentine libel cases which held

that the place of the wrongful act was the place whether the libel was first published.

The primary basis of the defense experts' opinion is that, before infection, there can be no liability. In their view, it makes no sense to talk about bringing suit, prior to the time any injury occurred, in the place where the injurious product was manufactured. No liability exists until the dangerous product actually causes injury — here, the infection. That is why the wrongful act in a products liability case occurs when the product causes the injury.

In his deposition, Dr. Rotman agreed that the defamed person is injured when the first publication occurs. In the libel situation, therefore, publication and injury are simultaneous, regardless of where the first publication occurs.

Rotman also agreed that a person could not file a lawsuit for an HIV infection before he was infected with HIV. (Rotman Dep. at 74-75, 82.)

In their supplemental memorandum, plaintiffs argue that in his deposition, defendants' witness Alterini admitted that in a book he wrote he stated that the act giving rise to liability in a products liability case is the act of manufacture. (Pls.' Supplemental Mem. at 4-6.) This is not a fair characterization of the testimony. The witness repeatedly denied that his book

stated that the tortious act was the act of manufacturing, and he made clear repeatedly that the act of manufacture was simply the _rationale_ for holding the manufacturer liable at such time as the harmful product caused injury. Without injury, there could be no liability. (Alterini Dep. at 86-97.)

We find the testimony of Alterini and Bueres to be persuasive. We believe it is an accurate prediction of what the courts of Argentina would regard as the tortious act in this case, namely, the infection of the plaintiffs in Argentina by the defendants' infectious products.

The Rotman approach would mean that a citizen of Argentina, injured in Argentina by an imported product manufactured outside the country, however distant, could not bring suit in Argentina. Suit could only be brought, at whatever inconvenience and expense, in the country where the injurious product was manufactured. It seems implausible that Argentina would adopt a Code provision restricting the rights of its citizens so severely. In this country, we think naturally about tort jurisdiction based on the introduction of injurious products into the forum state by the manufacturer or producer.[5] Whether "hecho" be translated into English as "event" or "act," why would

---

[5] _See generally_ _Keeton v. Hustler Magazine, Inc._,465 U.S. 770 (1984).

"act" not cover the act of introducing an injurious product into the country?   Dr. Rotman is thinking much too narrowly when he concludes that the word "act" can only mean manufacture.

Secondly, the Rotman view of the Code would nullify, at least in part, the election the Code gives a plaintiff to sue either where the harmful event occurred or where the defendant resides or is domiciled.   In a products liability case, against either a domestic or foreign manufacturer, the only "election" under the Rotman theory would be between the domicile of the manufacturer and place where it manufactured the product.   If the domicile and the place of manufacture turn out to be the same, as they often would, the right of election would be illusory.   If they are different, the plaintiff would have an election to that extent, but he still could not elect to sue in the place where he sustained his injury.   We doubt that the drafters of the Code intended to create such a limited right of election.

In fact, Dr. Rotman has no rational basis for his opinion, and we reject it as unreliable.[6]   We are satisfied that an Argentine court sitting at the place where a plaintiff was

---

[6]   We included in the summary of his deposition his testimony concerning the Robertson survey of what happened to 180 dismissed cases in order to give an indication of the care he takes to reach the right result.   He obviously gave only cursory attention to the Cornell Law Review article upon which he relied.

infected by defendants' products would have jurisdiction to entertain the plaintiffs' claims for damages.[7]

The next question regarding availability is whether the _Abad_ cases, if dismissed on _forum non conveniens_ grounds, could be refiled in Argentina. The defendants' experts say that they could be refiled. Dr. Alterini states that in his opinion such a right to refile is protected by Article 14 of the Constitution of Argentina, which recognizes the right of Argentine citizens to petition the courts. An Argentine court could not decline to exercise jurisdiction where it has subject matter jurisdiction. (Alterini Decl. at 5.) In his deposition, Prof. Alterini acknowledged that the constitutional provision refers to the right "to petition to the authorities," but he believes this includes "the judges and the courts." (Alterini Dep. at 108-109.) He admitted that he is not aware of any case that was brought in Argentina after it was dismissed in the United States for _forum non conveniens._ (Id. at 104.) Neither is he aware of any instance where an Argentine court has refused to accept such

---

[7] A similar conclusion was rendered by Judge Sarah Evans Barker in regard to an "automobile accident that occurred in Argentina involving death and serious injuries to Argentine victims, which was allegedly caused by defective automobiles introduced into the stream of Argentine commerce by new car dealers in Argentina and sold to Argentina consumers. Order Granting Defs.' Mot. to Dismiss Argentinian Accident Cases on _Forum Non Conveniens_ Grounds, Alonso v. Ford Motor Co., No. 1P-04-C-5796-B/S, at 14 (S.D. Ind. Jan. 31, 2007).

a case.  (Id. at 103.)   As noted supra pp. 7-8, defendants'
witness Bueres was of the same view.

The plaintiffs argue that the testimony of Alterini and
Bueres is so indefinite as to be unreliable.  "Indeed, Alterini
admitted that he was not sure that Argentine Courts would accept
jurisdiction after an *fnc* dismissal."  (Pls.' Supplemental Mem.
at 3.)   The actual question at the deposition was, "You agree
with me that you can't guarantee that a judge would rule in
Argentina consistent with your opinion on this issue?"   The
answer was "Of course not.  I can't guarantee that."  (Alterini
Dep. at 117.)   We regard the question as bordering on the
frivolous.  No expert witness can "guarantee" anything, and this
is especially true where the question is what a court is likely
to do in a case of first impression.  Plaintiffs also state:
"Alterini testified that Argentine legal scholars are split on
the issue of whether Argentine Courts could accept jurisdiction
after an *fnc* dismissal."  (Pls.' Supplemental Mem. at 3.)   The
portion of his deposition plaintiffs cite for this has nothing to
do with whether legal scholars are split.   Apparently they meant
to refer to page 117 again, where the question was "It's not just
judges who might disagree.  In this case, legal scholars disagree
on this issue in Argentina?"   The answer was "Of course.
Because this is not an exact science."  (Alterini Dep. at 117.)

The answer is simply a description of the typical situation in a case involving expert testimony. The testimony always concerns something that is not an "exact science," and each side can usually hire paid experts to support its position. The job of the judge is to decide which <u>opinion</u>, if any, is credible.

Plaintiffs again demonstrate their misperception of the nature of expert testimony by pointing out that defendants' witness Bueres made essentially the same kind of concession in his deposition. They quote the following question from page 82 of the deposition:

> Okay. So you don't know how the judges in Argentina will rule after a U.S. FNC dismissal; instead, you're telling us your opinion about how they should rule?

They quote the following as the answer:

> Exactly ...

(Pls.' Supplemental Mem. at 3.) Plaintiffs then conclude that "This admission alone is sufficient to deny Defendants' Motion to Dismiss. Defendants' experts cannot and will not state that these cases actually would be accepted in Argentina." (<u>Id.</u>) Even if "exactly" had been Bueres's complete answer to the question, plaintiffs' point would not be well taken. An expert opinion is not rendered weightless by the fact that it is an opinion rather than a "guarantee." The weight of the opinion

depends upon the reasoning behind it, and plaintiffs omitted the reasoning Bueres went on to give for his opinion:

> The decision of the American judge is not final. So the parties are not prevented from filing the action again. This is an opinion of my own that I consider reasonable, but I can't quote any specific analogous case.

(Bueres Dep. at 82.) Because the *forum non conveniens* dismissal is a dismissal without prejudice, involving no ruling on the merits, the surprising thing would be that any court otherwise having jurisdiction, wherever located, would refuse to permit a refiling. All Bueres is saying is that, while there appears to be no Argentine case that has ruled one way or the other on the question, he believes there is nothing that would bar a refiling.

The only authority plaintiffs cite for their contention that Argentine courts would not accept refiled cases is the opinion of their expert Dr. Garro. (Drs. Rotman and Garay did not address this subject.) Dr. Garro states in his declaration:

> Argentina is not an available forum for these cases because, regardless of whether Defendants are "amenable to process" in Argentina, the courts of Argentina cannot and will not exercise jurisdiction over a case in which the plaintiff has already opted, pursuant to Argentine jurisdictional rules, to file suit at the place where the defendant is domiciled or has its seat (main place of business).

(Garro Decl. at 3.) Prof. Garro's basis for this opinion is Article 5(4) of the Code, which he acknowledges does not

expressly address the situation of cases dismissed by foreign courts. (Garro Dep. at 58.) He found no Argentine case which either accepted or refused to accept a case dismissed by a foreign court on the basis of *forum non conveniens*. (<u>Id.</u> at 60-62.) Dr. Garro's opinion seems to be based on the theory that a plaintiff's option under Article 5(4) is exhausted if he files suit in a foreign court that has jurisdiction. But if the foreign court dismisses because it lacks jurisdiction, then the case could be refiled in an Argentine court having jurisdiction. Unlike a United States court, the Argentine court having jurisdiction would have no discretion to decline the case. (<u>Id.</u> at 72.)

In their initial memorandum, the plaintiffs refer to decisions of other Latin American courts, but we are concerned with the law of Argentina. What plaintiffs have to support their argument that the courts of Argentina would not accept the refiled cases is solely the opinion of Dr. Garro, which we have just described.

We find the opinions of defendants' witnesses Drs. Alterini and Bueres to be credible and the opinion of Dr. Garro to be farfetched. Plaintiffs elected to sue in the United States courts, but in the event we should dismiss for *forum non conveniens,* that election would be nullified. Should we dismiss,

it would be without prejudice to refiling in Argentina, with no ruling whatsoever on the merits. The notion that under those circumstances a court of Argentina otherwise having jurisdiction would refuse to exercise it because plaintiffs had unsuccessfully tried to sue in the United States has no rational basis. If there is some implication in plaintiffs' argument that by taking such an approach the Argentine courts would attempt to pressure foreign courts not to invoke *forum non conveniens,* we decline to assume that any such motive exists. We presume that the Argentine courts would act in good faith and according to what Drs. Alterini and Bueres consider the requirements of the Argentine constitution. Plaintiffs' attempt to opt for the United States forum would have been frustrated through no act of their own, and there is no reason to believe the courts of their own country would decline to accept their cases.

We conclude, therefore, that the courts of Argentina are available for the litigation of the Abad cases.

*    *    *    *

### Adequacy of the Argentine Forum

The plaintiffs in Abad, like the plaintiffs in Gullone, will, for the most part, be unable to prove which of the defendants' concentrates might have infected them. The basic reason for this is that it is usually impossible to pinpoint the

particular infusion of concentrate that gave rise to the infection. <u>See</u> <u>Gullone</u>, 484 F.3d at 957. The plaintiffs in <u>Gullone</u>, in what the Court of Appeals refer to as their "principal argument," <u>id.</u> at 956, contended that the United Kingdom recognized only "but for" causation and did not permit proof by way of market share or other theories of alternative liability. <u>Id.</u> A major portion of the Court of Appeals opinion was taken up with analysis of this alternative liability question, and it seems clear that the Court approved our decision that the United Kingdom was an adequate forum largely on the basis of its view that the United Kingdom would be likely to recognize alternative liability in the cases of the United Kingdom plaintiffs.

In their opening memorandum, the defendants' discussion of adequacy contains no reference to the question of alternative liability, nor is the subject mentioned in the declarations of the witnesses Alterini and Bueres. The first mention of the problem comes in the plaintiffs' memorandum in opposition, where they argue that "Argentina is an inadequate alternate forum because Plaintiffs who cannot identify which Defendants' Factor Concentrates infected them will be 'deprived of all remedies' there." (Pls.' Mem. in Opp'n at 9 (citing <u>Kamel</u>, 108 F.3d at 803).) Plaintiffs' discussion is quite short, citing only the

declaration of Dr. Garro that "imposition of liability in Argentina depends upon plaintiff's showing that the injuries were caused by a specific act of an individualized defendant ... Argentine law does not provide for alternative causation doctrines." (Id. at 10 (quoting Garro Decl. at 5).)

In his deposition, Dr. Garro was asked about this statement in his declaration:

> Q. You don't cite any Argentine legal sources for that paragraph in your declaration, do you?
> A. Correct, because I assume – my knowledge of Argentinian law, general knowledge of Argentinian law makes me feel comfortable enough to make that assertion without any specific citation.
> Q. Did you do anything to confirm that the statements in paragraph 12 are currently true under Argentinian law?
> A. I did not.

(Garro Dep. at 41.)

This ipse dixit of Dr. Garro would not be sufficient to persuade us that Argentine law would not recognize an alternative liability theory. For their part, the defendants have made no showing that the substantive law of Argentina does recognize alternative liability. They make a weak argument that their witness Bueres testified in his deposition that Argentina does recognize alternative liability (Defs.' Reply at 8), but the argument is simply wrong.[8] This standoff would lead us to

---

[8] The passage in the Bueres deposition to which defendants refer, p. 48, ll. 14-25 and p. 49, ll. 1-12, comes nowhere close to saying that an alternative liability theory is recognized by the

conclude that Argentina is an inadequate forum were it not for an aspect of Argentinian conflicts law that eliminates the problem. Plaintiffs seem not to have understood the significance of an argument they made in a later section of their brief. Contending that the possibility that Argentine law might govern all or part of the case would not make Argentina a more convenient forum, plaintiffs state that "Argentine law adopts and requires the application of United States substantive law regardless of where the case is tried," (Pls.' Mem. in Opp'n at 26 (citing Rotman Aff. ¶ 11).) In their reply memorandum, defendants point out that plaintiffs' argument is actually a concession that "the Argentine Plaintiffs will be able to pursue whatever alternative causation theories are available under United States law by filing suit in Argentina." (Defs.' Reply at 8.) We agree. Whatever proof of causation would be required by the United States district courts for the Southern District of Florida, the Northern District of California and the Northern District of Illinois, the same requirements would be imposed by the courts of Argentina. Plaintiffs make no other challenges to the adequacy of the Argentine forum, and we find that the courts of Argentina are adequate for the litigation of their claims.

---

Argentina courts. All the witness refers to is an appellate decision which "may have some significance" to the question. Confusingly, the "significance" relates to "strict liability."

\*     \*     \*     \*

We now turn to a balancing of the private and public interest factors that affect the relative convenience of the chosen and proposed alternative fora.  A plaintiff who sues in his or her home forum normally receives the benefit of the presumption that it is a convenient forum, and a defendant opposing that choice has a heavy burden of persuasion.  However, if the plaintiff "is suing far from home, it is less reasonable to assume that the forum is a convenient one and therefore 'the presumption in the plaintiff's favor "applies with less force."'" Gullone, 484 F.3d at 956 (citations omitted).  Here, the presumption in favor of plaintiffs' choices applies with less force" and we will balance the conveniences with that in mind.

## PRIVATE INTEREST FACTORS

Defendants contend that the three United States districts chosen by the plaintiffs – and, in fact, any United States jurisdiction – pose serious inconveniences for them.  These are the kinds of matters the courts have referred to as "private interests."

### Inability to Join Third-Party Defendants

As they did in the Gullone case, the defendants argue that it is only in the alternative forum that they could join as third-party defendants the other suppliers of factor concentrate,

whole blood and cryoprecipitates used by the <u>Abad</u> plaintiffs.
These other suppliers, located in Argentina and Europe, would not
be subject to the jurisdiction of United States courts, and the
defendants would therefore be deprived of the opportunity to show
that plaintiffs' infections were caused by their use of these
other products.  Other courts have found that this consideration
favored a *forum non conveniens* dismissal in blood products cases.
<u>Doe v. Hyland Therapeutics Divison</u>, 807 F. Supp. 1117, 1126
(S.D.N.Y. 1992); <u>Dowling v. Hyland Therapeutics Division</u>, 767 F.
Supp. 57, 59 (S.D.N.Y. 1991).

In <u>Gullone</u> we agreed with the defendants "that their ability
to join potential third-party defendants is a factor that weighs
in favor of the U.K. as the more convenient forum."  408 F.
Supp.2d at 584.  The Court of Appeals noted this finding but did
not comment on it.  484 F.3d at 958.

Just as the <u>Gullone</u> plaintiffs did, the <u>Abad</u> plaintiffs
impugn the sincerity of defendants' desire to implead third
parties.  (Pls.' Mem. in Opp'n at 16.)  They point out that in
the twenty years the hemophilia AIDS litigation has been pending
the defendants have never once impleaded any third parties.
However, plaintiffs do not deny the defendants' assertion that
most of them used blood products other than those that might have
been supplied by the defendants.  We do not know how often this

kind of situation has been presented in other cases. In any event, as we concluded in <u>Gullone</u>, it would be unfair for us to discount the seriousness of defendants' argument simply because they have not named third parties in other cases. Particularly where there is no direct proof of causation — and plaintiffs rely on some kind of alternative liability theory, as the plaintiffs here undoubtedly intend to do — the notion that other presently unnamed third parties could be found liable, either instead of these defendants or jointly with them, is not implausible. We believe the inability to join third parties is a substantial private interest factor weighing in favor of dismissal.

## Relative Ease of Access to Sources of Proof

Here we begin with the obvious fact that this MDL has been pending since December 1993 and that an enormous amount of pretrial discovery has been done under the liberal discovery rules that obtain in the United States. In fact, core discovery in the second-generation cases is closed. What remains is case-specific discovery, and even some of that has been done in the MDL. The remaining case-specific discovery will relate mostly to the medical histories of the plaintiffs, including their experience with products obtained from suppliers other than the present defendants. The defendants argue that the bulk of the MDL discovery was related to liability issues and that it will

not be necessary for plaintiffs to do any further liability discovery. Defendants, on the other hand, have much to do with regard to plaintiffs' medical histories and the possible liability of other blood product suppliers. The evidence regarding these matters is to be found mostly in Argentina. While the liberal discovery permitted in the United States is unknown in Argentina, nonetheless the Argentine court will order non-parties to produce documents relevant to the case. (Bueres Decl. at 9 ¶ 13.) Defendants would not be able to take the plaintiffs' depositions in Argentina, but they are willing to forego that and settle for medical or other third-party records they might be able to obtain by application to the court. If the cases were to remain in the United States, the defendants could seek third-party documents by way of Letters Rogatory under the Hague Convention, but that appears to be less satisfactory than applying for third-party documents in a case pending in Argentina. According to Prof. Bueres, Argentine Law No. 23480 provides that Argentine courts "will 'not enforce letters rogatory whose purpose is a procedure known as "pretrial discovery of documents" in Common Law States.'" (Bueres Decl. at 10 ¶ 16.)

It would appear, then, that defendants' access to necessary sources of additional proof would be substantially improved if

these cases were dismissed in the United States and refiled in Argentina. Since plaintiffs have already obtained all the liability discovery they need by way of the MDL, the benefit to the defendants would seem to outweigh any possible detriment to the plaintiffs.

But the plaintiffs see it quite differently. If the cases had to be refiled in Argentina, they believe that all of the liability evidence collected in the MDL would be forfeited, because it could not be introduced as evidence in an Argentine proceeding. They say that "in Professor Garay's long experience practicing before Argentine courts, he has never witnessed an Argentine judge allow discovery obtained outside of that court to be introduced in new Argentine litigation. Professor Rotman concurs that the MDL discovery would not be admitted in Argentine courts." (Pls.'s Mem. in Opp'n at 12 (citation omitted).)

This is another issue on which we will have to weigh the credibility of the expert witnesses as to what the law of Argentina is. Dr. Garay does say in his declaration that he has not found any case where an Argentine court has relied on discovery materials collected in the United States to reach a decision. (Garay Decl. at 7 ¶ 8.) When his deposition was taken, he conceded that he had not found a case where an Argentine court said it would refuse to consider proofs collected

in the United States by pretrial discovery. (Garay Dep. at 60.)
We are hesitant to rely on Dr. Garay's "long experience
practicing before Argentine courts." It will be recalled that he
is the witness who had no opinion as to whether plaintiffs could
have filed their suits in Argentina, nor could he opine as to
whether a plaintiff infected with HIV in Argentina could file
suit in Argentina. He did not have enough facts. (<u>Id.</u> at 48-
50.) Dr. Garay seems to be certain about the aspects of his
testimony which he understands to be favorable to the plaintiffs
but quite uncertain about everything else. His selective
approach does not inspire confidence in his opinions.

Like Dr. Garay, Dr. Rotman is unable to cite a case in which
an Argentine court has refused to accept evidence obtained in
pretrial discovery in a foreign country. He has had no personal
experience with a case where a foreign defendant was sued in an
Argentine court. (Rotman Dep. at 86-87.) He has not practiced
law in Argentina since 1982. (<u>Id.</u> at 89-90.) His opinion that
if the cases went back to Argentina the evidence obtained in
pretrial discovery would be lost "because it was not produced
according to the rules of production of evidence in Argentina,"
<u>id.</u> at 64, appears to be based simply upon the fact that there is
no Argentine case holding expressly to the contrary. We are not

persuaded by this opinion any more than we were persuaded by his opinion on the availability of the Argentine forum.

Our skepticism as to the opinions of Drs. Garay and Rotman is heightened by the fact that it makes no sense to us that an Argentine court would, say, reject sworn deposition testimony taken in the United States in accordance with the Federal Rules of Civil Procedure, especially where both sides agree that the testimony should be admitted.[9]

The lack of Argentine precedent is illustrated by the testimony of plaintiffs' third expert, Professor Garro, who acknowledged that he does not know of an instance in which an Argentine court has even been asked to consider deposition testimony from a foreign proceeding. (Garro Dep. at 95.) He said it is possible that an Argentine court might consider such a deposition as "documentary evidence." (Id. at 96.)

Defendants' experts have a very different view of how the Argentine courts would react to evidence taken in United States pretrial discovery. Professor Alterini stated that in his opinion the Argentine courts must accept all relevant evidence and that a failure to do so would be a violation of due process.

---

[9] One of the things the defendants will stipulate to in the event of a dismissal is that they will inform the Argentine courts that they have no objection to evidence that might be offered simply on the basis that it was obtained outside Argentina.

(Alterini Dep. at 51.) He refers to an Argentine Supreme Court case which held that "the process cannot serve to formally frustrate the real truth." (_Id._ at 56.) If testimony is given in the presence of the parties, the judge must consider it. (_Id._ at 58.) There is a "core provision" in the Argentine procedural code that provides for the admissibility of evidence that "does not go against moral issues and good practices." Argentine Law "is very liberal when it comes to the production of evidence." (_Id._ at 59.)

Defendants' other expert witness, Dr. Bueres, gave similar testimony:

> An Argentine judge, if the parties submit testimony rendered outside the court, the Argentine judge has to incorporate these testimonies to the case file. This would be the case, for example, of testimonies taken during pretrial discovery in the United States. If both parties agree to it, these are documents that are incorporated to the process. The judge can have a broader or a stricter criterion and so according to that, he could give greater or a lesser value to those declarations.

(Bueres Dep. at 73-74.) His basis for that opinion is section 386 of the Code of Procedure, which he read into the record as follows:

> Under power provided judges, we assess evidence according to the rules of reasoned judgment. They will have no obligation to express in their judgment the assessment they made except for those items of evidence that are essential for the resolution of the case.

(<u>Id.</u> at 115-116.)  The phrase "rules of reasoned judgment" seems consistent with the proposition that an Argentine court will take a common-sense approach to the admissibility of evidence.

We conclude that defendants have the better of the argument on the issue of whether relative ease of access to sources of proof weighs in favor of dismissal.  The defendants would be seriously handicapped in their access to relevant evidence available in Argentina should the cases remain in the United States, and, by contrast, because the relevant portions of the MDL discovery would be admissible in Argentina, the plaintiffs are not likely to suffer any substantial detriment should the cases be litigated in Argentina.

### Compulsory Process of Witnesses

Defendants argue that most of the damage witnesses reside in Argentina and could not be compelled to give testimony in the United States:

> [V]irtually *every* fact witness knowledgeable about what factor concentrates and other blood- and plasma- based therapies each Plaintiff received, about the regulation of such therapies in Argentina during the 1980s, about each Plaintiff's medical condition and care from birth to the present, and about each Plaintiff's current condition and alleged damages resides in Argentina.

(Defs.' Mem. in Supp. of Mot. to Dismiss at 17.)  Such witnesses would be numerous, considering that there are 619 Argentine-infected plaintiffs.  The plaintiffs do not concede this,

however, and argue that "[d]efendants failed to meet their burden of identifying which, if any, non-party Argentine witnesses would need to be compelled to attend a U.S. trial." (Pls.' Mem. in Opp'n at 13-14.)  We do not regard this as a serious objection. It is clear that defendants have no knowledge of the identities of the relevant medical witnesses for many of the plaintiffs, since many plaintiffs have not provided that information.  This is one of the reasons defendants desire to conduct what limited discovery they can in Argentina should the cases be refiled there.  It is self-evident that perhaps hundreds of Argentinian witnesses are involved.  Naming them at this point is in many instances impossible and, in any event, unnecessary.

Plaintiffs argue that it is they, rather than the defendants, who would suffer if the cases were moved to Argentina, since there are "liability depositions that would not be admissible in Argentine proceedings." (Id. at 15.)  But we have just rejected this argument.  We believe the depositions would be admissible in Argentina.  If the cases were refiled there, plaintiffs would have all of their liability evidence available from the MDL and have no need of compulsory process to assist them in proving liability.  Their damage witnesses would be as available to them as they would be to the defendants.

None of these questions are entirely one-sided. There will be some inconvenience to each side, no matter where the cases are litigated, here or in Argentina. The question is one of balancing the inconveniences, and it is clear to us that the defendants' need for compulsory process in Argentina greatly outweighs any benefit plaintiffs would derive from having continued access to compulsory process in the United States.

## Translation of Evidence

Each side argues that the cost of translation is a substantial private interest factor that should weigh in its favor in considering the motion to dismiss. Defendants argue that if the cases remain in the United States, the plaintiffs "will have, at the very least, over 600,000 pages of documents that must be translated [from Spanish into English] and will present over 3,000 witnesses whose testimony will need to be translated if these cases are tried in the U.S." (Defendants' Mem. in Supp. of Mot. to Dismiss at 18.) On the other hand, this prohibitive cost can be avoided if the cases are refiled in Argentina, where these same witnesses can testify in Spanish and a relatively small amount of liability evidence will need to be translated from English into Spanish.

The defendants assume that every scrap of medical records that may exist will have to be translated from Spanish into

English should the cases remain in the United States. Their estimate of an average of 1,000 of pages per plaintiff is not persuasive, because the length of a patient's illness, or even the length of his treatment, does not necessarily correlate to the number of records, let alone the number of records that would be evidentiary. Treating physicians vary as to the extent of their record-keeping and certainly every page of every record kept by a physician would not be offered in evidence or received if it were offered. We can think of no instance in our experience in which a physician's entire file was received in evidence in a personal injury case. Usually, the evidence is the testimony of the physician, and the function of the file, at most, is to refresh his or her recollection. The file is not received into evidence. We are somewhat unclear as to how medical evidence would be presented if the cases were to remain in the United States. Plaintiffs would have the burden of going forward with the evidence, and it is they, rather than they defendants, who would have to bear the translation costs of any evidence from Argentina that they were to offer. We have no basis for surmising what translation costs would have to be incurred by the defendants, nor have they offered any analysis of the question. They are content simply to multiply the number of

plaintiffs times the number of pages of medical records they assume would have been created over time for each plaintiff.

The plaintiffs contend that if the cases were refiled in Argentina it would be necessary to attach to the complaints copies of all documents in the MDL depository, consisting of 11,949,219 pages. The cost of translation would be $286,781,040. Even if 100 translators were to work on the assignment simultaneously, it would require 7,966 days (over 21 years) to complete the task. (Pls.' Mem. in Opp'n at 18.)

Plaintiffs' argument is irresponsible. It is difficult to imagine the bulk of a complaint to which millions of documents would be attached, and surely no court, wherever located, would require any such thing. Plaintiffs' own expert witness, Dr. Garro, testified that "documentary _evidence_" is required to be attached to the complaint. (Garro Dep. at 87-88 (emphasis added).) This means all documents that are "relevant to [the] case." (Id. at 88.) The documents that are attached are those that are material and significant to the outcome of the case." (Id. at 89.) Defendants' expert Dr. Alterini testified that "documentary evidence has to be enclosed with the complaint or the complaint has to individualize it. It is enough to individualize all the evidence except for documentary evidence." (Alterini Dep. at 47.) "Individualizing" means "making reference

to [the evidence] and saying where it is," for instance, in a certain case pending before a court or ministry. The discovery materials gathered in the United States could be individualized. (Id. at 48.) We take this to mean that the relevant, non-duplicative and probative documents a plaintiff would rely on to prove his case would be attached to the complaint, and the excerpts of depositions the plaintiff intends to offer would simply be referred to by way of "individualizing."

The liberal standard of relevance for discovery purposes – that the document could lead to the discovery of admissible evidence – is, by definition, wholly divorced from the standard of relevance at trial. The plaintiffs have made no effort to distinguish between documents which were reviewed and found irrelevant from those which were found to be even arguably probative. The paralegal who ran the numbers for the plaintiffs states in her affidavit that in reviewing the first generation documents she "did not review a single document, and [has] no personal knowledge as to what is contained in those documents." The same is true for her review of the second generation documents. "I did not review the contents of any of the documents, and I have no personal knowledge as to what is contained in those documents, other than they consist of pages of

medical records and their translations." (Aff. of Maria Florencia Cudos, Ex. A to Pls.' Mem. in Opp'n, ¶¶ 10, 12.)

It would be difficult to say which party has the greater exposure to translation costs, and we certainly could not base any decision on the hyperbolic arguments the parties have made.[10] We are not inclined to waste time trying to determine who has engaged in the lesser hyperbole and will settle for calling this particular item a wash.

On the whole, then, the private interest factors weigh strongly in favor of dismissal. The factors favoring the defendants are (1) the inability to join third-party defendants, (2) the comparative ease of access to sources of proof and (3) the compulsory process of witnesses. Translation of evidence is not a factor that points in either direction, but even if it favored plaintiffs, its weight would be minor in relation to the three factors that strongly favor the defendants. There are no private interest factors that weigh in favor of the plaintiffs.

*    *    *    *

---

[10]    We hope that this performance will not be repeated in the remaining *forum non conveniens* motions.

## PUBLIC INTEREST FACTORS

## Local Interests in Having Controversies Decided at Home

The defendants argue that Argentina has a strong interest in "ensuring compensation of its injured citizens ... and in regulating medicines distributed in Argentina." (Defs.' Mem. in Supp. of Mot. to Dismiss at 21.) There is no disagreement about this. "Plaintiffs do not dispute that Argentina has an interest in protecting its citizens from injuries caused by defective products, and in insuring that they are adequately compensated for their injuries." (Pls.' Mem. in Opp'n at 22.) The parties differ, however, as to whether Argentina has a greater interest in the controversy than any relevant United States jurisdiction. We say "relevant" because, unlike the defendants, the plaintiffs take the position that the entire United States, not any particular state, is the territory that should be examined to find the local interest that is to be compared to that of Argentina. (Id. at 23-24.)[11] We do not understand that to be the law. The local interest that is relevant is the interest of the state in which the federal district of filing is located.

---

[11] Plaintiffs cite Esfeld v. Costa Crociere, S.P.A., 289 F.3d 1300, 1313 (11th Cir. 2002) for this proposition. We believe they misread the case. The Court was addressing the question of whether a federal district court, considering a *forum non conveniens* motion and finding that another federal district is more convenient, should transfer the case to that district pursuant to 28 U.S.C. § 1404(a) rather than dismissing it.

That was the analysis of the Seventh Circuit in <u>Gullone</u>, 484 F.3d at 959, and certainly in <u>Kamel</u>, 108 F.3d at 804-05 ("The district court ... made a permissible inference that Indiana residents have a mere passing interest in this case.").

Therefore, we compare the interests of the citizens of Argentina to the interests of the citizens of Florida (where 600 of the Argentine-infected plaintiffs filed suit), Illinois (where two Argentine-infected plaintiffs filed suit), and California (where 17 Argentine-infected plaintiffs filed suit). Plaintiffs make no attempt to show any particular interest that the citizens of Florida have in this litigation. This is where they rely on the argument that the "local" interest to be considered is that of the entire United States, which would include Florida. As the defendants point out, the only real connection between Florida and this litigation is that the offices of plaintiffs' attorneys are located there. As for Illinois, plaintiffs point out that the defendant Baxter's headquarters is located here and that it has a manufacturing facility in Round Lake, Illinois. We do not think these facilities generate an interest in this litigation that is in any way comparable to the interests of Argentina. The interest of Illinois is arguably more than that of Florida, but barely so. California presents a different situation, as the Seventh Circuit pointed out in <u>Gullone</u>:

California has an interest in the case because
defendants Alpha, Bayer and Cutter are headquartered
there; defendant Bayer has its main manufacturing plant
for Factor Concentrates there; and the plasma
collection process took place there. These are not
trivial local interests.

484 F.3d at 959.

Plaintiffs make the point that if there is a federal
district that has a substantial interest in the litigation, we
should consider transferring the cases to that district rather
than dismissing them outright in favor of Argentina, at least
insofar as our decision would be governed by this particular
public interest factor. We do consider that option and, for
several reasons, reject it. First, we consider the forum of
these plaintiffs' residence to be the place where the greatest
impact of their injuries has been felt and will continue to be
felt into the indefinite future. While California would be
concerned with the prevention of whatever misconduct might be
proved to have occurred in connection with the plasma collecting
and manufacturing processes that took place there, we have been
offered no evidence that, whatever that conduct might have been,
it is still occurring. Certainly much has been learned about
high-risk plasma donors since this litigation was begun twenty
years ago, and the need to treat factor concentrate in order to
kill viruses has long since been accepted in the industry.

California's interest in past wrongs, if they occurred, seems somewhat distant. A present interest would be more evident if there were a need for further action addressed to some present danger.

We do not discount the interest of California, but we are not inclined to transfer this litigation to the Northern District of California simply because California has a greater interest than Florida or Illinois. California does not, in our view, have as great an interest as Argentina does. Moreover, even if we were to regard the interest of California as equal to that of Argentina, that would not control our decision as to the defendants' motion to dismiss. Rather, we would weigh that public interest factor along with the various private interest factors in making the ultimate decision as to whether the motion to dismiss in favor of Argentina should be allowed.

## Avoidance of Unnecessary Problems in Conflicts of Law or Application of Foreign Law

Defendants argue that a refiling of these cases in Argentina would relieve United States courts of the burden of resolving complicated conflicts of law questions. They suggest that if the cases were tried, the law of Argentina would probably apply. (Defs.' Mem. in Supp. of Mot. to Dismiss at 24-26.) But the defendants do not point out any particular problem that a United

States court would have in applying the substantive law of Argentina.  Their experts, Drs. Alterini and Bueres, explain that the law of Argentina provides for the kinds of claims presented in these cases and suggest no reason to think there would be anything complicated about it.  The only real problem we thought might arise is in regard to the question of alternative liability.  If alternative liability were not recognized in Argentina, that would, as a practical matter, deprive the plaintiffs of any remedy at all.  But, as plaintiffs pointed out in responding to this argument about conflicts of law, the courts of Argentina will apply <u>United States law</u>.  (Pls.' Mem. in Opp'n at 26.)  Therefore, whether the trials take place in one of the United States federal districts or in Argentina, any conflicts problems would be identical.  We agree with the plaintiffs that problems in choosing which law to apply are not a public interest factor weighing in favor of dismissal.

### **Burdening Citizens in an Unrelated Forum with Jury Duty**

Defendants make the traditional argument that jury duty in these complex and protracted cases should not be imposed on the citizens of Florida, Illinois or California.  (Defs.' Mem. in Supp. of Mot. to Dismiss at 26-27.)  They cite <u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. 501, 508-09 (1947), which did say that "[j]ury duty is a burden that ought not to be imposed upon the people of

a community which has no relation to the litigation." As the Court pointed out in <u>Gullone</u>, however, the interests of California in this litigation are not trivial and "[t]hey certainly do not make California a forum with 'no relation' to the litigation." 484 F.3d at 959.[12]

The plaintiffs discount the jury service burden on any particular district and argue that the focus should be not on a particular district but on the entire United States. With that perspective, they see no problem in imposing jury service in these cases on citizens of any of the fifty states, including Florida and Illinois. (Pls.' Mem. in Opp'n at 25.)

We think the jury burden factor would weigh in favor of dismissal if Florida were the only chosen forum involved. Illinois has an interest only as to one of the four defendants, but the interest of California in this litigation, based on the activities of three of the four defendants, is probably sufficient to justify imposing a burden of jury service on its citizens, at least as to claims against those three defendants. Therefore, we find that this public interest factor does not weigh in favor of dismissing the California cases. But it does weigh in favor of dismissing the Florida cases, and, as to the

---

[12] We think it would be accurate to say that Florida has "no relation" to the litigation and that Illinois has "some relation."

two claims filed in this district, we regard the jury service factor as favoring dismissal as to three of the four defendants.

## Court Congestion

Plaintiffs argue that it would take far longer to litigate these cases in Argentina than it would in their chosen United States district courts. Their expert witnesses have provided estimates that it might take up to twelve years to resolve the cases in Argentina, whereas defendants' experts offer estimates as low as two to four years. Defendants conclude that this factor is therefore "neutral," and explain this is why they did not urge it in favor in dismissal.

The testimony of the experts is not helpful. None of them has had any experience at all in the handling of a case remotely like these Abad cases in Argentina or anywhere else. Their opinions are not and cannot be based on practical experience, and their attempts to draw analogies to what they understand to be the experience of others in Argentinian litigation are not persuasive.

Attempting to quantify the length of time it "would" take to resolve one of these cases in one jurisdiction or another is beset with difficulty. Comparing the number of cases on court dockets can yield information that is relevant, but hardly decisive. The more relevant question is how long these

particular cases will take to conclude, and that is, first of all, a function of whether they will be settled or tried. Some 5200 claims in the first generation of this MDL were resolved in 1997 as part of a class action settlement.[13] The settlement came out of the blue, to the entire surprise of this court and the attorneys for both the defendants and the plaintiffs, when the executives of the corporate defendants decided to make what turned out to be an offer that almost all of the plaintiffs were eager to accept. Had those cases not been settled, and had it been necessary to try them all or even a substantial percentage of them, the district courts where they had been filed would still be backed up, and would be for many years to come, with untried first-generation HIV-hemophilia cases. But due to the unanticipated settlement, the first-generation cases are gone, and the courts have only the second-generation cases to deal with at present. The effect they will have on the dockets of the districts in which they were filed is not yet apparent, because they are still part of this second-generation MDL and are nowhere near the point where the decision to try or to settle any particular case will have to be made.

---

[13] See In Re Factor VIII or IX Concentrate Blood Prods. Litig., 159 F.3d 1016, 1017-18 (7th Cir. 1998).

In gauging the impact of the Argentinian cases on district court dockets, it would be misleading to consider them in isolation. They are part of a large MDL involving cases filed by plaintiffs from many countries besides Argentina.[14] Should the Abad cases remain in the United States, there is no reason to think their trials would take preference over those of second-generation cases from other countries. Predicting trial dates with any degree of certainty for more than a selected few of the Abad cases would be impossible.

Aside from the question of whether the cases will be tried or settled, the nature of the trial will be important. A trial that occurs in the United States will be by jury and will take many weeks to complete. Whether more than one claim can be joined for trial before the same jury is an open question, depending upon whether the trial judge thinks the jury can give fair consideration to more than one of these lengthy, complex cases simultaneously. If the cases were to be refiled in Argentina, there would be no jury trials, and that could result in a shorter time to disposition, especially if the judge were able to consolidate claims for trial.

---

[14] *Forum non conveniens* motions to dismiss are being filed by the defendants as to each of those other countries, and, unfortunately, there is no way of predicting how long it will take to resolve those motions, not to mention the likely appeals that will follow in each instance.

As the Court noted in <u>Gullone</u>, "[t]o the extent that court congestion matters, what is important is the speed with which a case can come to trial and be resolved." 484 F.3d at 958. That can be broken down into at least two inquiries — <u>whether</u> the case will be tried and, if so, how long it will take for the case to come to trial. As to each inquiry, there are various unknowns. We would not have believed the first-generation cases would be settled (there was not the slightest suggestion from the attorneys on either side that it was a possibility), and yet they were. It is not inconceivable that the <u>Abad</u> cases, or at least some of them, could end in settlement. There is also the possibility of successful dispositive motions — a matter that, at this stage, is not under consideration.[15]

Another factor that affects the "speed with which a case can come to trial" is the diligence of plaintiffs' attorneys. This is recognized in the testimony of both sides' experts. (Bueres Decl. at 11; Garay Dep. at 57.) How vigorously plaintiffs' attorneys will prosecute these cases, in whatever venue they proceed, is something that is difficult to predict.

We are unable to say that the factor of court congestion is something that weighs either for or against dismissal. If the

---

[15] The defendants have suggested that many of the <u>Abad</u> claims have already been settled in Argentina, and that apparently is a matter which will have to be considered by some court in a pretrial motion.

cases are not settled, or decided on dispositive motions, it is certain that they will require many years to conclude, regardless of whether they are handled in the United States or in Argentina. We therefore regard court congestion as a neutral factor.

### The Question of Court Corruption

Plaintiffs' expert witness Dr. Rotman refers in his affidavit (¶¶ 25, 28, 30) to a number of newspaper articles, surveys and editorials alleging political corruption in Argentina and inefficiency and corruption in the courts of Argentina as well. In paragraph 29, he refers to a United States Department of State report to the effect that judicial personnel were "at times subject to political manipulation." Dr. Rotman also refers to a speech given by defendants' expert Dr. Alterini in which he was critical of the Argentine courts and stated that "in Argentina today there is no law." (Id. ¶ 31.) Plaintiffs argue, therefore, that Argentina is neither an adequate nor a convenient forum for the litigation of the Abad cases. (Pls.' Mem. in Opp'n at 21-22.) Defendants respond that plaintiffs have made an inadequate showing of corruption. "They cite only newspaper editorials, law review articles, and unsubstantiated expert reports, which provide no evidence of any corruption in the civil judiciary, much less corruption specifically relevant to Plaintiffs' cases." (Defs.' Reply at 16.) We agree with the

defendants. Despite the fact that plaintiffs' three expert witnesses have practiced law in Argentina, none of them cites an example of court corruption of which he has personal knowledge or even reliable information. Editorials and opinion surveys about governmental corruption are no substitute for evidence of judicial corruption that would be relevant to the handling of the <u>Abad</u> cases, and evidence is what is required. <u>See</u> <u>Tuazon v. R.J. Reynolds Tobacco Co.</u>, 433 F.3d 1163, 1179-80 (9th Cir. 2006); <u>Leon v. Million Air, Inc.</u>, 251 F.3d 1305, 1311-13 (11th Cir. 2001). Dr. Rotman has not practiced in Argentina since 1982. Defendants' experts Drs. Alterini and Bueres, are presently members of the Argentinian legal community and have been for many years. Both expressed the opinion that judicial corruption is not a major problem. (Alterini Decl. at 12; Bueres Decl. at 12-13; Bueres Dep. at 127.) We are unable to credit the opinion of Dr. Rotman over those of Drs. Alterini and Dr. Bueres.

We find that court corruption is not a factor weighing against dismissal.

                    *     *     *     *

To summarize the public interest factors, the interest of Argentina in having the controversy decided at home weighs strongly in favor of dismissal. The burden of jury duty weighs in favor of dismissing the Florida cases, which include most of

the 619 Argentine-infected claims. (This factor does not favor dismissal of the Northern District of California cases or arguably not the two claims filed in the Northern District of Illinois, at least as far as the defendant Baxter is concerned.) Avoiding unnecessary conflicts of law questions does not cut either way and is neutral. Court congestion and court corruption are both neutral. The net result is that the one non-neutral public interest factor favors dismissal.

<u>**CONCLUSION**</u>

Because Argentina is an available and adequate alternative forum for the adjudication of plaintiffs' claims, and because both the private and public interest factors favor dismissal, we find that Argentina is a substantially more convenient forum than the Southern District of Florida, the Northern District of California, or the Northern District of Illinois for the adjudication of plaintiffs' claims. Accordingly, subject to the conditions noted below, we will enter an order granting the defendants' motion to dismiss this case on the ground of *forum non conveniens*.

In order to ensure the adequacy of the Argentine forum for the prosecution of plaintiffs' claims, and to ensure that any judgment obtained by plaintiffs in that forum will be enforceable, the dismissal will be subject to the following

conditions, most of which defendants have indicated are, in substance, agreeable to them:

A. Defendants agree to accept service in actions brought by plaintiffs in a court of Argentina, so long as plaintiffs file such actions within 120 days of this court's order dismissing this action or, in the event of an appeal, within 120 days of any order by the Seventh Circuit Court of Appeals or the United States Supreme Court that has the effect of making the dismissal order final;[16]

B. Defendants agree to satisfy a final judgment rendered by a court of Argentina.;

---

[16] In Gullone, we had a similar list of requirements, and this requirement "A" provided for 90 days rather than 120 days. This caused problems for the plaintiffs and they sought to extend the time. We were unable to grant an extension, however, because the defendants had stipulated to only 90 days. The problem in the Abad cases is the unknown amount of time it will take to comply with the requirement that, as Dr. Alterini put it, "documentary evidence has to be enclosed with the complaint or the complaint has to individualize it." (Alterini Dep. at 47-49.) We do not know what this requirement will entail. The volume of claims will certainly be unusual for the Argentine courts, and the identification of the exact kinds of documents that need to be filed or individualized will have to be explored in advance of filing. We are satisfied that the plaintiffs will be able to comply with whatever the requirement is, but we want to be sure that they are allowed enough time to do it. One hundred twenty days should be ample, but we are not sure that anything less would suffice. In the event of an appeal from this decision, plaintiffs can do the necessary investigation while the appeal is pending. There is no reason why they should wait until the appeal is decided.

C. Defendants agree to exclude from calculation of statutes of limitations time periods the period of time plaintiffs' claims have been pending in this action and, in addition, any period of time during appeal from the dismissal order prior to an order of the Seventh Circuit Court of Appeals or the United States Supreme Court that has the effect of making the dismissal order final, as well as the 120-day period provided for in condition A; and

D. Defendants agree to advise the Argentine court that they have no objection to the admissibility of depositions taken in the United States or other materials obtained in discovery in the United States simply on the basis that the depositions or other materials were obtained outside Argentina.[17]

Upon the filing of defendants' statement that they agree to each of the conditions A through D, the court will enter an order dismissing this action on the ground of *forum non conveniens*.

---

[17] Defendants would, of course, retain the right to object to the admissibility of the materials on any ground afforded by the rules of evidence.

The statement should be filed no later than ten days from the date of this opinion.


DATED:    January 17, 2008


ENTER:    _____
          John F. Grady, United States District Judge