**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE FACTOR VIII OR IX | ) | MDL 986 |
| CONCENTRATE BLOOD PRODUCTS | ) | |
| LIABILITY LITIGATION | ) | 93 C 7452 |
| | ) | |
| ---------------------------------- | ) | |
| | ) | |
| ELI ASHKENAZI, et al., | ) | |
| | ) | This document relates to: |
| Plaintiffs, | ) | |
| | ) | 05 C 2793 |
| v. | ) | |
| | ) | |
| BAYER CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**
*(Ruling on Israel Forum Non Conveniens Motion)*

This is the third opinion in which we rule on a motion by the defendants in this multidistrict litigation to dismiss the claims of the plaintiffs on the ground of *forum non conveniens*. The claims under consideration are brought by residents of Israel. The history of the litigation is set forth in our first *forum non conveniens* decision, In re Factor VIII or IX Concentrate Blood Products Liability Litigation, 408 F. Supp. 2d 569, 570-73 (N.D. Ill. 2006) (granting United Kingdom *forum non conveniens* motion), aff'd In re Factor VIII or IX Concentrate Blood Products Litigation, 484 F.3d 951 (7th Cir. 2007). We will not repeat that history here. We refer to that decision as the Gullone case. The

second decision involved residents of Argentina and will be referred to as the <u>Abad</u> case. We granted the motion to dismiss that case as well, <u>In Re Factor VIII or IX Concentrate Blood Products Litigation</u>**,** 531 F. Supp. 2d 957 (N.D. Ill. 2008), and the decision is presently on appeal.

We will refer to these Israeli claims as the <u>Ashkenazi</u> case, because that is the name of the first-named plaintiff in the low-numbered case with Israeli plaintiffs.

The <u>Ashkenazi</u> plaintiffs make the same basic allegations as all of the other foreign plaintiffs in the second generation cases. They are hemophiliacs who claim to have contracted HIV and/or the hepatitis C virus ("HCV") in Israel from using factor concentrates manufactured by one or more of the four defendant pharmaceutical companies. The contamination allegedly occurred as a result of the defendants' negligence. When the defendants were alerted to the problem, they took steps to eliminate the contamination in the products they distributed in the United States, but allegedly continued to distribute their contaminated products for use by hemophiliacs in foreign countries.

There are 135 <u>Ashkenazi</u> plaintiffs, most of whom are named in four complaints that were filed in this court. The remaining plaintiffs are named in a complaint filed in the Northern District of California and transferred to this district by the Judicial Panel on Multidistrict Litigation.

The defendants' motion to dismiss is based upon their contention that the litigation of these cases in either the Northern District of Illinois or the Northern District of California would be oppressively inconvenient for them. The law that governs their motion to dismiss is well settled and was discussed at some length in our <u>Gullone</u> and <u>Abad</u> opinions as well as the Seventh Circuit opinion in <u>Gullone</u>.

## THE LAW OF FORUM NON CONVENIENS

As we stated in <u>Abad</u>,

> The steps involved in a *forum non conveniens* analysis are well-settled. The first step is a two-part inquiry as to whether the proposed alternative forum ... is <u>available</u> and <u>adequate</u> for the litigation of plaintiffs' claims. <u>Kamel v. Hill-Rom Co.</u>, 108 F.3d 799, 802-03 (7th Cir. 1997) ("An alternative forum is available if all parties are amenable to process and are within the forum's jurisdiction. An alternative forum is adequate when the parties will not be deprived of all remedies or treated unfairly."). If the alternative forum is both available and adequate, "the district court must then balance the private and public interest factors that emerge in a given case." <u>Id.</u> (citations omitted).

531 F. Supp. 2d at 959-60.

## AVAILABILITY

The defendants have stipulated, as a condition of dismissal, that they will accept service of process in Israel. In addition, their alleged fraudulent conduct occurred in Israel, and that conduct caused injury in Israel. For those reasons, the defendants' expert witness on Israeli law, retired judge Dr. Gabriel Kling, states that the Israeli courts would have

jurisdiction over these claims. (Defs.' Mem. In Supp. Of Mot. To Dismiss, Ex. 1, Decl. of Judge Dr. Gabriel Kling (retired) ¶ 16.)

The plaintiffs argue in response that the Israeli courts would not have jurisdiction. They rely upon the declaration of their Israeli law expert, retired judge Dan Arbel, a former Director of the Israeli Courts System. Judge Arbel refers in his declaration to Israel's Regulation of Civil Procedure 500(7), which allows jurisdiction over a non-resident defendant if "the legal claim is based upon an act or an omission which has taken place within the borders of the State." He states that this Regulation "has been narrowly construed by the Israeli courts to exclude instances where foreign negligent conduct (e.g., actions by a foreign producer of a defective product) results in injury in Israel." (Decl. of Judge Dan Arbel (retired), ¶¶ 25-27.) Judge Arbel cites three cases in his declaration that stand for the proposition that Regulation 500(7) would not support jurisdiction where an act or omission committed in a foreign country caused damage in Israel. (Id. ¶¶ 28-30.)

When his deposition was taken by the defendants, Judge Arbel admitted that these three case citations are irrelevant to a situation where, as here, the defendant agrees to accept service in Israel. Regulation 500(7) refers only to service outside Israel. The defendants in the cases he cited were resisting extraterritorial service. (Arbel Dep. at 33.) In addition to citing an inapplicable regulation, Judge Arbel made no mention of

the fact that, according to plaintiffs, an important part of the defendant's <u>conduct</u> occurred in Israel, in that they committed fraud upon the government of Israel and Israeli healthcare providers by failing to disclose that the products they were delivering to Israel were contaminated. (<u>Ashkenazi</u> Compl. ¶ 4.)

As a fallback position, the plaintiffs argue that even if the Israeli courts would have jurisdiction, they might in their discretion refuse to exercise it. This proposition is based upon Judge Arbel's opinion that if Israeli judges concluded that the plaintiffs were refiling their cases unwillingly in Israel, and that they actually preferred the American forum, "it is very probable that the Israeli courts will feel some commitment to their citizens and will decide not to let them pay the price of an allegedly wrong decision of the American judiciary." (Arbel Decl. ¶ 33.) In his deposition, Judge Arbel admitted that he knew of no instance where an Israeli judge had made such a ruling. (Arbel Dep. at 93-94.) He appears to believe that his opinion is buttressed by the fact that the Israeli courts "did not have jurisdiction in the first place" and that there was an "absence of any jurisdiction according to Regulation 500 of the Civil Procedure Regulations." (Arbel Decl. ¶ 33.) But he is wrong about Regulation 500, as he admitted in his deposition.

Judge Arbel's notion that an Israeli court would decline to exercise jurisdiction in retaliation for a *forum non conveniens*

dismissal in the United States is pure speculation. The <u>Abad</u> plaintiffs made a similar suggestion in regard to the Argentinian courts, and we rejected it because we presumed "that the Argentine courts would act in good faith." 531 F. Supp. 2d at 970. We indulge the same presumption as to the Israeli courts and decline to give any weight to Judge Arbel's speculation.

We conclude that the Israeli courts are an available forum for the litigation of the <u>Ashkenazi</u> cases.

### <u>ADEQUACY</u>

As noted above, "[a]n alternative forum is adequate when the parties will not be deprived of all remedies or treated unfairly." <u>Kamel</u>, 108 F.3d at 803 (citing <u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. 235, 255 (1981)). It appears from the declarations and depositions of the parties' experts that the remedies in Israel are substantially similar to those in the United States, and there is no evidence that the plaintiffs would be treated unfairly in the Israeli courts. The major procedural difference is that there are no jury trials in Israel, but this does not affect the adequacy of the forum. In fact, plaintiffs concede that the Israeli forum is adequate: "Plaintiffs do not challenge Defendants' contention that the Israeli courts are an adequate alternate forum." (Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss at 6 n.1.)

\*　　\*　　\*　　\*

We turn, then, to a consideration of the private and public interest factors that are relevant to the question of convenience. When a plaintiff sues in his home forum, "it is reasonable to assume that this choice is convenient." <u>Kamel</u>, 108 F.3d at 803.

> Conversely, if the plaintiff is suing far from home, it is less reasonable to assume that the forum is a convenient one and therefore the presumption in the plaintiff's favor applies with less force....

<u>Gullone</u>, 484 F.3d at 956 (quotation marks omitted). The Seventh Circuit went on to explain:

> We do not understand this as any kind of bias against foreign plaintiffs. That would be inconsistent with many treaties the United States has signed as well as with the general principle that our courts are open to all who seek legitimately to use them. It is instead a practical observation about convenience. A citizen of Texas who decided to sue in the federal court in Alaska might face an equally skeptical court, which might conclude that convenience requires a change in venue under the federal statutory counterpart to *forum non conveniens*, 28 U.S.C. § 1404(a).

<u>Id.</u> The <u>Ashkenazi</u> plaintiffs turn these observations of the Court on their head and interpret them to mean that the treaty obligations of the United States require that in weighing the various public and private interest factors, the plaintiffs' choice of forum must be given "maximum deference." (Pls.' Mem. at 7-8.) We reject plaintiffs' argument and will be guided by the ruling of the Seventh Circuit.

## PRIVATE INTEREST FACTORS

The defendants argue that the courts chosen by the plaintiffs, the Northern District of Illinois and the Northern District of California, are seriously inconvenient for them for a number of reasons. We will examine the parties' arguments in regard to each of these "private interest factors."

### Inability to Join Third-Party Defendants

The plaintiffs have provided the defendants with Patient Profile Forms containing information as to their use of factor concentrates and other blood products. (Defs.' Mem., Ex. 2.) Defendants point out that nearly a third of the plaintiffs indicate that in addition to one or more of the defendants, a company identified as Merieux may have been a source of factor concentrate that they infused. Many of the plaintiffs have also used other blood therapies such as whole blood, plasma and cryoprecipitate provided to them in Israel either by the government or by foreign suppliers. None of these providers is subject to suit in the United States, but it appears that all of them would be subject to suit in Israel. Defendants argue that "if the Israeli Plaintiffs re-file their claims in Israel, Plaintiffs could sue these blood banks, health care providers, governmental entities and foreign factor concentrate processors in the first instance. And even if they did not, Defendants could themselves bring these third parties into the litigation." (Defs.' Mem. at 9.)

The plaintiffs' response to this argument is that their hematologist, Dr. Uri Martinowitz, "will confirm that the vast majority of the factor concentrate infused by the Israeli Plaintiffs was Defendants' product." (Pls.' Mem. at 11.) Plaintiffs also argue that the defendants have failed to do the necessary discovery to determine whether there are in fact other blood-product suppliers who could be responsible for plaintiffs' infections. (Id.)

In reply, the defendants argue that we should reject as speculative the possible testimony of Dr. Martinowitz, who has not furnished a declaration and has not been deposed. (Defs.' Reply at 5.) It appears, therefore, that plaintiffs' reliance upon Dr. Martinowitz is based on their attorneys' expectation as to what his testimony will be. Obviously, it would be inappropriate for this court to base any ruling on that expectation. Defendants represent that approximately 122 of the 135 Israeli plaintiffs have acknowledged in their Patient Profile Forms that they used cryoprecipitate. Defendants also refer to articles co-authored by Dr. Martinowitz that recognize that cryoprecipitate can transmit both the HIV and HCV infections to hemophiliacs. Therefore, even assuming that Dr. Martinowitz will somehow be able to establish that "the vast majority of the factor concentrate infused by the Israeli Plaintiffs was Defendants' product," this would not exclude the other blood products, such as cryoprecipitate, as a possible

cause of any infections.  It is worth noting at this point that proof of causation in these cases is difficult as best and usually requires resort to some facilitating theory such as market share or alternative liability.  In Gullone, we explained the problem:

> We will begin with an explanation of why the causation problem exists.  The Gullone complaint does not specify which plaintiff was infected by the concentrate of which defendant.  It alleges, rather, that the plaintiffs were infected by the concentrates of the defendants.  This is because, with the exception of a plaintiff who used nothing but the concentrate of one fractionator, a plaintiff simply does not know when he was infected and by what particular infusion of concentrate. Hemophiliacs are likely to use more than one brand of concentrate over time, depending upon which brand the supplier has in stock.  The infection is caused by a single contaminated infusion and is not aggravated by subsequent infusions. The problem is further complicated by the fact that the virus may not appear in the blood of the infected person until many years after the infusion that caused the infection.

408 F. Supp. 2d at 577.

In Abad, we concluded that defendants' inability to join third-party defendants in Argentina was a factor that weighed in favor of dismissal.  We will quote what we said there because it applies to this case as well:

> Particularly where there is no direct proof of causation — and plaintiffs rely on some kind of alternative liability theory, as the plaintiffs here undoubtedly intend to do — the notion that other presently unnamed third parties could be found liable, either instead of these defendants or jointly with them, is not implausible.  We believe the inability to join third parties is a substantial private interest factor weighing in favor of dismissal.

531 F. Supp. 2d at 972-73.

Our conclusion is that this factor strongly favors dismissal in favor of the Israeli forum.

**Relative Ease of Access to Proof and Compulsory Process**

Defendants argue that this factor[1] weighs in favor of dismissal from the standpoint of pretrial discovery. They point out that all of the discovery available in the United States has been obtained in this MDL (discovery has long since been closed) and can be used by both sides in Israel should the cases be refiled there. This is true of both the documents produced and any deposition testimony that constitutes an admission. (Kling Decl. ¶¶ 30, 32.) The MDL discovery would be relevant to the alleged fraud committed by the defendants in Israel – what they did and not represent to users of their products concerning the safety of the products – and to the wide spectrum of evidence relating to plaintiffs' injuries and damages. Although plaintiffs have furnished Patient Profile Forms, the information provided is sketchy. It gives no specific detail as to the plaintiffs' medical histories, such as when they began using particular blood products, how long they used them, from whom they obtained them, the frequency of use, and the onset and treatment of their infections. This information will be found primarily in the records of plaintiffs' doctors and other health-care providers in Israel. If

---

[1] In _Abad_, we treated availability of compulsory process as a separate factor.

the cases remain in the United States, the defendants could seek discovery from these Israeli sources by way of the Hague Convention, but defendants argue that it would be considerably more convenient if the discovery were conducted in Israel.

Aside from the matter of pretrial discovery, if any of these cases should be tried in the United States, the defendants would have no way of compelling the attendance of Israeli residents as trial witnesses. Nor would any Israeli court compel the appearance of an Israeli citizen for a deposition to be used in a trial to be conducted in the United States. (Kling Decl. ¶ 35.) On the other hand, an Israeli court may order any witness located in Israel to appear at trial in Israel, either at the request of a party or on the court's own initiative. (Id. ¶ 33.)

Plaintiffs respond to defendants' arguments by referring to a passage of our Gullone opinion in which we stated that all liability discovery was available in the United States. (Pls.' Mem. at 9.) In retrospect, that statement was not accurate. We overlooked the fact that the allegedly false representations of the defendants concerning the safety of their products would have occurred in large part in the United Kingdom, and discovery relating to those representations would have been accessible primarily in the United Kingdom. In any event, we will not repeat the mistake. Although discovery depositions are not permitted in Israel, it is likely that there will be documentary evidence

available there that would be relevant to plaintiffs' fraud allegations.

As far as the availability of evidence relating to damages is concerned, plaintiffs' response is that it will eventually be furnished to the defendants to the extent that plaintiffs are able to supply it. Thus far, however, production has been limited and we are unwilling to assume that it will be increased substantially over time. Moreover, the defendants have no means of compelling production of records that are in the possession of Israeli third parties, such as plaintiffs' physicians and other health-care providers.

We acknowledge that pretrial discovery is more limited in Israel than it is in the United States. However, what pretrial discovery remains in these cases is available primarily in Israel, not in the United States, and we have no doubt that it would be more productive if conducted in Israel rather than at long distance from the United States.

With regard to possible trials, the defendants would be unable to compel the attendance of Israeli citizens as witnesses at trials held in the United States (nor could they take depositions in Israel for use in the United States). While the compulsory process of Israeli courts could not reach non-residents of Israel, the deposition testimony that has been accumulated in this MDL could be offered by either side at an Israeli trial. This would include the

deposition testimony of defendants' employees containing admissions useful to the plaintiffs.

On the whole, we believe that this factor of access to proof and compulsory process weighs strongly in favor of dismissal.

### "Other Practical Problems"

Under this heading, the defendants focus on the problem of translating relevant documents from Hebrew into English if the cases remain in this country, as opposed to the allegedly diminished cost of translation should the cases be refiled in Israel. Defendants point out that many Israeli judges and lawyers are fluent in English, and, since there are no juries in Israel, the cases could be handled there largely without translation from English into Hebrew. The defendants rely upon their expert witness Kling for their view that English-speaking witnesses would not need to have their testimony translated into Hebrew. (Kling Decl. ¶ 34.)

Plaintiffs' expert witness Arbel states in his declaration that "[f]or all witnesses testifying in English, a translator would be required. All documents using medical or other technical terminology would need to be translated into Hebrew." (Arbel Decl. ¶ 24.)

Neither of these expert witnesses gives a single example of a case where English translation either was or was not required, and we have no reason to believe that either of their opinions is based

upon actual observation of what occurs in the Israeli courts. Defendants argue in their reply brief that Judge Arbel, at his deposition, "backed away" from his assertion that translation is required for all witnesses testifying in English, citing the transcript at 87-88. We do not read his testimony that way. He stated that in most of the cases there is translation because if "one of the people participating in the procedure doesn't know English very well," there has to be a translation. (Arbel at 88.)

Should any of these cases actually be tried in the United States, an unknown number of documents would have to be translated from Hebrew into English, and the testimony of non-English speaking witnesses would always have to be translated into English. Trials in Israel could probably be conducted at a lesser translation cost in the event that the judge and all of the parties were fluent in English. What percentage of the trials that would comprise is impossible to estimate on the basis of the evidence the parties have produced.

The defendants have not persuaded us that a difference in translation costs is a significant factor in the convenience analysis. We find the factor to be neutral.

*       *       *       *

This completes the discussion of the private interest factors relied upon by the defendants. The remainder of the discussion in

this section of the opinion will deal with the private interest factors the plaintiffs rely upon in opposing dismissal.

### **Plaintiffs' Privacy Concerns**

This is an unusual argument. Plaintiffs fear that the stigma they would incur in Israel by making public their HIV and HCV infections would make them unemployable, ineligible for mortgages and insurance and subject to ostracism by the general population. The rely upon the declaration of Gina Goldstein, a social worker and psychotherapist, who states that "[t]he serious effects of exposure in the community make it impossible for these patients to stand in court in Israel." (Goldstein Decl. ¶ 16.) Plaintiffs appear to be arguing that, if their cases are dismissed in this country, none of them would be refiled in Israel. In short, they would give up their opportunity for any recovery. "The fear of exposure and the terrible repercussions that such exposure entails explain why hemophiliacs have not sued and would not sue the Defendants in Israel." (<u>Id.</u> ¶ 4.) Ms. Goldstein's declaration seems to indicate that her knowledge as to what each of the plaintiffs would do is based upon her personal contact with each of them:

> Because I personally know all of the HIV patients and
> most of the HCV patients, I know most of their personal
> problems. I have been trying to help them, their
> parents, spouses and other family members to cope with
> their physical, emotional, social and economic problems.

(Id. ¶ 14.) However, when her deposition was taken by the defendants, she acknowledged that she had never discussed the question of filing a lawsuit with any of her patients. (Goldstein Dep. at 102-03.) Her information about HIV patients being unable to obtain mortgages or life insurance was gathered from the internet and "some stuff at work." She does not remember what the materials were. She has worked with patients in trying to get mortgages and insurance, and she acknowledges that when someone applies for insurance they are required to disclose that they have HIV. (Id. at 70, 76-77.)

Ms. Goldstein stated in her deposition that HIV patients receive monthly payments from the Israeli government. (Id. at 104-05.) All of the HIV-infected plaintiffs in this case receive such government compensation, as do their spouses and children. (Id. at 80-84.)

Ms. Goldstein's opinion that the plaintiffs in this case would not refile in Israel is not persuasive. While it is true that HIV patients in this country, in Israel and throughout the world, do face a certain amount of social rejection, we think it is also true that at least in the more developed countries, where education is the rule, there is a public awareness that HIV can be contracted from blood products such as the very medication involved in this case. We find it difficult to believe that the unfortunate

plaintiffs in this case would be treated in Israel with the kind of blanket ostracism that Ms. Goldstein describes.

Moreover, to the extent the plaintiffs would be interested in keeping their identities confidential should they file suit in Israel, plaintiffs' expert, Judge Arbel, acknowledges that they can file under pseudonyms and that court records are generally kept confidential. He initially discounted these possibilities, but finally admitted that the plaintiffs' privacy could be protected (despite his concerns about "freedom of the press"). (Arbel Dep. at 77-87.) While filing under pseudonyms and sealing court files is not a guarantee that a plaintiffs' identity will not be inadvertently disclosed, based on our experience in this MDL we would say that disclosure would happen only very rarely. In all the years this two-generation MDL has been pending, we can recall no instance in which the identity of a plaintiff who sought confidentiality has been disclosed.[2]

We find that plaintiffs' concerns about their privacy are not a factor weighing against dismissal.

### Plaintiffs' Lack of Funds to Re-Litigate in Israel

Plaintiffs argue that they lack the financial resources to litigate in Israel and point out that "Israeli civil procedure

_____

[2] Defendants point out that the Israeli plaintiffs have not sued under pseudonyms in these Ashkenazi cases, making their identities "readily available to any Israeli reporter with access to the internet." (Defs.' Reply at 8.) One would think that if the plaintiffs were indeed as sensitive as Ms. Goldstein makes them out to be, they would have avoided any possibility of public notice by filing under pseudonyms.

requires litigants themselves to front the expenses of litigation, including the high costs of medical reports that are prerequisite for filing a claim." (Pls.' Mem. at 13-14.) However, Judge Arbel admitted in his deposition that Israeli lawyers are permitted to represent plaintiffs on a contingency fee basis and that plaintiffs' American lawyers would be permitted to continue with the financial arrangements they have made with the plaintiffs in the United States, including the advancement of costs incurred in Israel. (Arbel Dep. at 16, 142-43.)

In the <u>Gullone</u> appeal, the Seventh Circuit considered the plaintiffs' argument that the "loser pays" rule in the United Kingdom would be an "extreme impediment" to their funding of the litigation. The Court rejected the argument, commenting that the English Rule "must be regarded as the kind of unfavorable difference in legal system that carries little weight." 484 F.3d at 958.

In view of what Judge Arbel says about contingent fees and the ability of plaintiffs' American lawyers to continue with their commitment to advance the costs of litigation, the plaintiffs should encounter no substantial difficulties in funding litigation in Israel. Even if they would, however, it would be the kind of problem that, as the Seventh Circuit indicated, would not weigh against dismissal of the <u>Ashkenazi</u> cases.

*       *       *       *

To sum up the private interest factors, we find none that weigh against dismissal and two that weigh strongly in favor of dismissal: defendants' inability to join third-party defendants and the relative ease of access to proof and compulsory process.

## **PUBLIC INTEREST FACTORS**

### **Local Interest in Having Controversies Decided at Home**

The parties disagree as to whether the Northern District of Illinois and the Northern District of California on the one hand, or the nation of Israel on the other, has the greater interest in adjudicating the controversy. This issue was dealt with in both Gullone[3] and Abad.[4] In Gullone, we decided that the interests of the United Kingdom outweighed those of the Northern District of California, and the Court of Appeals found no reversible error. Commenting on the Northern District of California, the Court stated:

> In the end, a rational person might come to either conclusion on this record: some might think that the greater interest lies in the place where the companies operated and allegedly committed the wrongs; others might find a greater interest in the place where the victims suffer from those wrongs and where the financial impact of the consequences will fall. Put another way, the record contains enough evidence to support the conclusion that the citizens of the United Kingdom have a greater interest in this controversy than those of the Northern District of California. In light of the fact that the plaintiffs have not sued in their home forum, and therefore that the presumption of convenience in their

---

[3] 484 F.3d at 959.

[4] 531 F. Supp. 2d at 977-79.

> favor applies with less force, we see no reversible error
> in the district court's conclusion that the defendants
> met their burden here.

484 F.3d at 959 (internal quotation marks and citation omitted).

In their response, the plaintiffs quote this same language from the

Seventh Circuit opinion in Gullone and state that "[d]efendants

proffer nothing that conclusively weighs in favor of Israel's

interests." (Pls.' Mem. at 17.) But whatever "conclusively"

means, it is not the test. The test is whether Israel has

significantly more interest in the litigation than do Illinois and

California, and we think it does.

The plaintiffs also argue that the people of California and

Illinois have a strong interest in deterring the manufacture of

dangerous products that can injure their own citizens as well as

the citizens of foreign countries. This is true, but, as we

pointed out in Abad:

> [W]e consider the forum of these plaintiffs' residence to
> be the place where the greatest impact of their injuries
> has been felt and will continue to be felt into the
> indefinite future. While California would be concerned
> with the prevention of whatever misconduct might be
> proved to have occurred in connection with the plasma
> collecting and manufacturing processes that took place
> there, we have been offered no evidence that, whatever
> that conduct might have been, it is still occurring.
> Certainly much has been learned about high-risk plasma
> donors since this litigation was begun twenty years ago,
> and the need to treat factor concentrate in order to kill
> viruses has long since been accepted in the industry.
> California's interest in past wrongs, if they occurred,
> seems somewhat distant. A present interest would be more
> evident if there were  a need for further action
> addressed to some present danger.

531 F. Supp. 2d at 978.

In the _Ashkenazi_ cases, we have again the situation where "some might think that the greater interest lies in the place where the companies operated and allegedly committed the wrongs; others might find a greater interest in a place where the victims suffer from those wrongs and where the financial impact of the consequences will fall." _Gullone_, 484 F.3d at 959. There is evidence that the wrongs occurred in Illinois and California, but the impact of those wrongs – if they occurred – is being felt in Israel and will continue to be felt in Israel for a long time to come. The interest of Israel is present and continuing. For that reason, we find this public interest factor to weigh in favor of dismissal.

### Avoiding Unnecessary Problems and Conflicts of Law or Application of Foreign Law

Defendants cite this factor, but they have failed to demonstrate that there are any particularly difficult questions of conflicts law or foreign law that would be particularly difficult for an American court. Choice of law questions are encountered with some frequency, and the declaration of plaintiffs' expert Judge Kling indicates that Israeli tort law involves no concepts that would be difficult for an American judge to understand. (Kling Decl. ¶¶ 18-27.)

We conclude that this factor does not weigh in favor of dismissal.

**Burdening Citizens in an Unrelated Forum with Jury Duty**

Defendants argue that it would be unduly burdensome for citizens of Illinois and California to serve on multi-week jury trials that might occur if the cases remained in the United States. (Defs.' Mem. at 14.) We agreed with a similar argument the defendants made in Gullone, 408 F. Supp. 2d at 590, but the Court of Appeals held this to be an improper consideration. 484 F.3d at 958. The Court stated: "To the extent that court congestion matters, what is important is the speed with which a case can come to trial and be resolved." Id. Inasmuch as there are no jury trials in Israel, we have little doubt that, if any significant number of these cases were actually to be tried, the 135 Ashkenazi plaintiffs would have their cases "come to trial and be resolved" faster in Israel than in the Northern District of Illinois, where most of the claims have been filed. As we understand the Seventh Circuit's decision in Gullone, it would be appropriate for us to consider the question of juries in this connection – that is, not in connection with any burden upon the jurors, but, rather, as a question of how quickly the cases could be resolved.

But there would be a problem even with this approach. It depends on the assumption that there will be a substantial number of trials, and we have no way of knowing whether that will actually happen. As we pointed out in Abad, almost all of the thousands of first-generation cases were settled, literally out of the blue,

when the defendants' corporate decision-makers decided to make an offer that was acceptable to almost all of the plaintiffs. 531 F. Supp. 2d at 980-81. These <u>Ashkenazi</u> cases, too, could be settled, or any of the other unpredictable events affecting speed of disposition that we discussed in <u>Abad</u>, 531 F. Supp. 2d at 980-81, could intervene regardless of whether the cases remain in the United States or are refiled in Israel. We are therefore unable to give any weight to the jury service factor and must regard it as neutral.

## Court Congestion

The final public interest factor is one urged by the plaintiffs, court congestion. They argue, based upon the declaration of Judge Arbel, that it would probably take up to seven years in Israel to reach an initial judgment on any of the plaintiffs' claims, and up to a total of twelve years if there is an appeal. (Arbel Decl. ¶¶ 20, 22.) This is because of the relatively small number of judges and the more than one million filings per year they are required to handle. In his deposition, Judge Arbel admitted that the more than one million filings per year include every filing in every court, even speeding tickets. (Arbel Dep. at 47-49.) The <u>Ashkenazi</u> cases would be filed in district court, where, in 2006, 115,000 cases were opened and 118,000 cases were closed. (<u>Id.</u> at 47-48.) Again, Judge Arbel has proved to be a witness whose testimony requires dissection.

Furthermore, it does not appear that he has had any actual experience in the handling of any case remotely similar to Ashkenazi. Confronted with a report of an interview he gave while he was Director of Courts, he admitted that the average time to disposition in the district court is three years. (Id. at 132-33.)

In the Northern District of Illinois, where most of the 135 Ashkenazi claims are pending along with a large number of other second-generation cases filed by foreign plaintiffs, it is difficult to be optimistic as to how long it would take for any of these cases to reach trial, if any of them is ever in fact tried. At the present time, the second-generation cases are stalled in this *forum non conveniens* phase, with appeals likely to be taken from whatever decision we reach on any of the motions to dismiss. Most of the recent filings have been in this district, so there is no question of possible remand to the docket of a transferor court that might be less congested. If the judges of this court had nothing to do but try the second-generation cases that have been filed here, it would be many years before they had all been tried. The fact is, of course, that the Northern District judges have large dockets with criminal cases requiring speedy trial, as well as other civil cases that would have to be handled along with the second-generation factor concentrate cases.

For these reasons, it would be difficult to estimate the comparative length of time to disposition, even on the assumption

that, wherever the dispositions occur, every claim will be tried. But when the uncertainties discussed in <u>Abad</u>, 531 F. Supp. 2d at 980-81, are added to the mix, the comparison becomes more tenuous if not impossible.

We are unable to say court congestion is a factor that either favors or weighs against dismissal. It must be considered neutral.

\*       \*       \*       \*

Summarizing the public interest factors, the interest of Israel in having the controversy decided at home weighs somewhat in favor of dismissal. Avoiding unnecessary problems and conflicts of law or application of foreign law is neutral. Burdening citizens in an unrelated forum with jury duty is neutral. Finally, the factor of court congestion is neutral.

\*       \*       \*       \*

## CONCLUSION

Israel is an available and adequate alternative forum for the adjudication of plaintiffs' claims. The private and public interest factors favor dismissal in favor of the Israeli forum. Accordingly, we find Israel is a substantially more convenient forum than the Northern District of Illinois or the Northern District of California for the adjudication of plaintiffs' claims. Subject to the conditions noted below, we will enter an order granting the defendants' motion to dismiss this case on the ground of *forum non conveniens*.

In order to ensure the adequacy of the Israeli forum for the prosecution of plaintiffs' claims, and to ensure that any judgment obtained by plaintiffs in that forum will be enforceable, the dismissal will be subject to the same conditions we required in the Abad case, see 531 F. Supp. 2d at 982-83.

A.  Defendants agree to accept service in actions brought by plaintiffs in a court of Israel, so long as plaintiffs file such actions within 120 days of this court's order dismissing this action or, in the event of an appeal, within 120 days of any order by the Seventh Circuit Court of Appeals or the United States Supreme Court that has the effect of making the dismissal order final;

B.  Defendants agree to satisfy a final judgment rendered by a court of Israel;

C.  Defendants agree to exclude from calculation of statutes of limitations time periods the period of time plaintiffs' claims have been pending in this action and, in addition, any period of time during appeal from the dismissal order prior to an order of the Seventh Circuit Court of Appeals or the United States Supreme Court that has the effect of making the dismissal order final, as

well as the 120-day period provided for in condition A;
and

D.   Defendants agree to advise the Israeli court that
they have no objection to the admissibility of
depositions taken in the United States or other materials
obtained in discovery in the United States simply on the
basis that the depositions or other materials were
obtained outside Israel.[5]

Upon the filing of defendants' statement that they agree to
each of the conditions A through D, the court will enter an order
dismissing this action on the ground of *forum non conveniens*.  The
statement should be filed no later than 10 days from the date of
this opinion.

DATED:     June 4, 2008

ENTER:     _____
           United States District Judge

---

[5]     Defendants would, of course, retain the right to object to the
admissibility of the materials on any ground afforded by the rules of evidence.